UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------

OMOWALE ST. JUSTE,

                              Plaintiff,              **MEMORANDUM & ORDER**
                                                      10-CV-4729 (MKB)

                    v.

METRO PLUS HEALTH PLAN, CITY OF
NEW YORK HEALTH AND HOSPITALS
CORPORATION, CITY OF NEW YORK, ILEANA
FLORENTINO, RICARDO ALANIZ and MICHAEL
STOCKER,

                              Defendants.

---------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

 Plaintiff Omowale St. Juste brings the above-captioned action against Defendants Metro

Plus Health Plan ("Metro Plus"), City of New York Health and Hospitals Corporation ("HHC"),

the City of New York, Ileana Florentino, Ricardo Alaniz and Michael Stocker, alleging claims of

religious discrimination, retaliation and hostile work environment in violation of Title VII of the

Civil Rights Act of 1964, 42 U.S.C. § 2000-e, *et seq.* ("Title VII"), 42 U.S.C. § 1983, the New

York State Human Rights Law, N.Y. Exec. Law § 290, *et seq.* ("NYSHRL") and the New York

City Human Rights Law,  N.Y.C. Admin. Code, § 8–101 *et seq.*, ("NYCHRL"). Defendants

moved for summary judgment as to all claims.  The Court heard oral argument on March 4,

2014.  For the reasons discussed below, the Court grants Defendants' motion for summary

judgment as to Plaintiff's claims brought pursuant to Title VII, NYSHRL and § 1983.  The Court

declines to exercise supplemental jurisdiction over Plaintiff's claims brought pursuant to the

NYCHRL and dismisses those claims without prejudice.

## I. Background

### a. Plaintiff's hiring and initial employment

Plaintiff Omowale St. Juste is an African-American male who converted to Islam at the age of twenty-three.  (Def. 56.1 ¶ 5; Pl. 56.1 ¶ 5.)  Defendant Metro Plus provides inexpensive health insurance options for New York City residents and is a subsidiary of HHC.[1]  (Def. 56.1 ¶ 1; Pl. 56.1 ¶ 1.)  Plaintiff began working with Metro Plus on June 23, 2008, as a Medicaid Enrollment Sales Representative ("ESR"), where he was responsible for educating New York residents about Medicaid and enrolling them in Medicaid plans.  (Def. 56.1 ¶¶ 8, 13; Pl. 56.1 ¶¶ 8, 13.)  Plaintiff was a member of the team located at Woodhull Hospital in Brooklyn, and worked at different sites in Brooklyn including the Federal Courthouse.  (Def. 56.1 ¶ 39; Pl. 56.1 ¶ 38.)[2]

Plaintiff was obligated by his religious observance to attend congregational prayer, otherwise known as *Jumu'ah* prayer, (Def. 56.1 ¶ 21; Pl. 56.1 ¶ 20), and while assigned to the Woodhull Hosptial team, Plaintiff attended Friday prayer during the lunch hour, typically at the Masjid-At-Taqwa, a mosque in Brooklyn, (Def. 56.1 ¶¶ 54–55; Pl. 56.1 ¶¶ 53–54).  It took Plaintiff an hour and a half to attend *Jumu'ah* prayer, including travel time between the mosque and Woodhull Hospital.  (Def. 56.1 ¶ 56; Pl. 56.1 ¶ 55.)  Plaintiff therefore required an additional thirty minutes for lunch on Fridays.  Plaintiff had a verbal agreement with his supervisor, Florentino, that Plaintiff did not need to include this additional time in his time sheets. (Def. 56.1

---

[1]  Defendant Michael Stocker is the Chairman of the Board of HHC.  (Def. 56.1 ¶ 2; Pl. 56.1 ¶ 2.)

[2]  Plaintiff's Rule 56.1 Statement of Undisputed Facts omitted a response to paragraph 20 of Defendant's Rule 56.1 Statement; as a result, the subsequent paragraphs in Plaintiff's Rule 56.1 Statement correspond to the previously-numbered paragraph in Defendant's Rule 56.1 Statement.

¶ 59; Pl. 56.1 ¶ 58.)  Instead, he could offset the additional thirty minutes with after-hours work at either an event or a home visit.  (*Id*.)  Plaintiff's first supervisor, Telvis Austin, appointed Masjid-At-Taqwa, a mosque in Brooklyn, as a recruiting site, (Def. Ex. B, Deposition of Omowale St. Juste ("St. Juste Dep.") 69:12–69:17; St. Juste Aff. ¶ 39), where Plaintiff was scheduled to work on Wednesdays, (Def. 56.1 ¶ 41; Pl. 56.1 ¶ 40).

Plaintiff asked his instructors if it was acceptable for him to wear his *thawb* to work and they informed him that wearing his *thawb* fell within Metro Plus's dress code. (St. Juste Aff. ¶¶ 8, 9; St. Juste Dep. 4:17-74:25.)  A *thawb* is a religious garment which resembles a priest's robe and covers the wearer from his shoulders to his shins.  (St. Juste Aff. ¶ 2; St. Juste Dep. 61:17-61:23.)  Plaintiff wore a *thawb* to work and would typically pair it with a blazer, vest, and dress pants.  (St. Juste Dep. 61:17–23; St. Juste Aff. ¶ 10.)  Plaintiff admits that wearing the *thawb* is not a mandatory requirement for Muslims, and wearing a suit would comply with his religious beliefs as it comports with the religious obligation of dressing modestly.  (Def. 56.1 ¶¶ 18, 19; Pl. 56.1 ¶ 19; St. Juste Dep. 62:14-64:9.)

### b.  Plaintiff's supervision by Alaniz

On April 1, 2009, Alaniz, the Associate Marketing Director at Metro Plus, became Plaintiff's manager while Florentino was on personal leave.  (St. Juste Dep. 150:3–150:6; Def. Ex. C, Deposition of Ricardo Alaniz ("Alaniz Dep.") 24:2–24:7.)  Alaniz supervised Plaintiff directly for two weeks, and indirectly from mid-April until October 2009.  (Def. 56.1 ¶¶ 43, 71; Pl. 56.1 ¶¶ 42, 70; Alaniz Dep. 24:1–25:3.)  On Thursday, April 2, 2009, Alaniz sent an email scheduling a 3:00 p.m. meeting at Elmhurst Hospital for Friday, April 3, 2009.  (St. Juste Aff. ¶ 46; Pl. Ex. 6.)  Plaintiff replied to Alaniz's email stating, "I will be late for the meeting due to Friday religious services which end at about 2:20 pm."  (Def. 56.1 ¶ 75; Pl. 56.1 ¶ 74; Pl. Ex. 6.)

Alaniz responded by saying "this is unacceptable and your timely attendance is required. This meeting is paramount . . . and attendance is mandated." (Def. 56.1 ¶ 76; Pl. 56.1 ¶ 75.) Plaintiff attended Friday prayers and arrived five minutes late to the meeting which had not yet begun. (Def. 56.1 ¶ 79; Pl. 56.1 ¶ 78; St. Juste Aff. ¶ 48.) Plaintiff was not disciplined for being late to the meeting. (Def. 56.1 ¶ 78; Pl. 56.1 ¶ 78.)

A week later, Alaniz noticed that Plaintiff had not returned to Woodhull Hospital within the normal timeframe for lunch, did not see Plaintiff at his station, and did not have documentation on file from Plaintiff requesting time off. (Def. 56.1 ¶¶ 84, 86; Pl. 56.1 ¶¶ 83, 85; Alaniz Dep. 120:4–18.) Alaniz left a message with co-workers requesting that Plaintiff visit Alaniz when Plaintiff returned. (St. Juste Aff. ¶ 96; Alaniz Dep. 120:21–25.) Plaintiff claims that when he met with Alaniz, Alaniz made derogatory comments about the *thawb* calling it "unprofessional according to American culture." (St. Juste Aff. ¶ 51.) Alaniz also informed Plaintiff that he was "stealing company time" by attending Friday prayers and that Plaintiff's attendance at these prayers was subject to Alaniz's discretion. (*Id.*) Plaintiff informed Alaniz that he attended *Jumu'ah* prayers on Fridays and therefore required additional time for lunch, (Def. 56.1 ¶ 87; Pl. 56.1 ¶ 86), and Alaniz responded by stating that such behavior was inappropriate and "not conducive for the marketing operations," (Alaniz Dep. 125:3–5).

Subsequent to this meeting, Joseph Chasse, Associate Executive Director of Marketing, requested that Plaintiff wear a suit and not a *thawb* when working at the Federal Courthouse. (Def. 56.1 ¶ 81; Pl. 56.1 ¶ 80; St. Juste Dep. 83:9–20.) Alaniz subsequently discontinued the use of Masjid-At-Taqwa as a Metro Plus work site, (Alaniz Dep. 133:4–134:25; St. Juste Aff. ¶ 97),

according to Defendants, because of low enrollment numbers, (Def. 56.1 ¶ 40; Aotaniz Dep. 133:4–15, 134:14–23).[3]

Plaintiff claims that, at an unspecified time, Alaniz told him that his attendance at Friday prayers was a "privilege" that would only continue so long as he kept meeting his weekly enrollment goal. (St. Juste Dep. 181:16–23.) On May 21, 2009, Alaniz emailed Plaintiff a copy of Metro Plus's policy with respect to ethnic and religious holidays. (Def. 56.1 ¶ 89; Pl. 56.1 ¶ 88; Def. Ex. S.) Alaniz explained in the email that he "will genuine[ly] make every effort to accommodate your needs but at the same time I also have an obligation to the corporation to abide by all rules and regulations as previously explained," and directed Plaintiff to reach out to Belinda Barneys, the Director of Labor Relations in the human resources department, to obtain clarification on the policy. (Def. 56.1 ¶ 90; Pl. 56.1 ¶ 89; Def. Ex. S.) Plaintiff reached out to Ryan Harris, Chief Human Resources Officer, who told Plaintiff that Metro Plus would accommodate his request to attend Friday prayers except where it affected the company's operations. (Def. 56.1 ¶ 91; Pl. 56.1 ¶ 90.)

HHC's Operating Procedure on Ethnic and Religious Holidays provides that approved leave for observance of ethnic or religious holidays could be charged to annual leave or compensatory time credits, and, if the request for leave is otherwise appropriate, could be granted and charged against future accumulation of either annual or compensatory time if an employee had insufficient vacation days or accumulated compensatory time. (Pl. Ex. 4 ("HHC

---

[3] The dates on which the mosque was first appointed as an enrollment site, and later discontinued are not in the record before the Court. Plaintiff states that the mosque site was discontinued a few days after a meeting with Alaniz in which Alaniz "insulted my wearing of the thawb and negatively commented on my attendance of Friday prayers." (St. Juste Aff. ¶ 97.) The record elsewhere indicates that a meeting between Plaintiff and Alaniz, in which Alaniz commented on the wearing of the *thawb* and on Plaintiff's attendance at Friday prayers, took place on or about April 10, 2009. (St. Juste Aff. ¶ 51.)

Operating Procedure No. 20-18") at 2.)  The policy also provides that each major operating unit "must establish the amount of advance notice required for submission of leave requests, and a procedure to ensure that employees are informed of the requirement well in advance of the time requests must be provided."  (*Id*. at 2.)  A request for leave, whether annual leave or compensatory time, for a religious or other holiday must be made through submission of an "SR-70" form at least two weeks in advance.  (Def. 56.1 ¶ 57; Pl. 56.1 ¶ 56.)

Alaniz met with Harris from the human resources department on or about May 24, 2009, and subsequently concluded that the hospital "could not reasonably accommodate [Plaintiff's] request for more than a one-hour lunch" on Fridays.  (Alaniz Dep. 114:12–17.)  According to Defendants, Metro Plus operates in "a very regulated monitored industry," and the New York City Department of Health and other city and federal government agencies require a schedule to be sent to them "two months in advance on where [Facilitated Enrollers ("FE"s)] are going to be located, including their working hours.  (Def. 56.1 ¶ 50; Alaniz Dep. 68:3–24.)  The city and federal agencies send monitors out and if they do not see a particular employee at a scheduled site, Metro Plus could be fined and cited.  (Def. 56.1 ¶ 50; Alaniz Dep. 68:3–24; Def. Ex, D and Pl. Ex. 2, Deposition of Ileana Florentino ("Florentino Dep.") 53:8–12.)  Alaniz testified that it was understood that the hours between 12 noon and 2 p.m. were allocated for employee lunch, "in which none of the regulatory agencies will come to monitor us."  (Alaniz Dep. at 68:13–16.)  Alaniz informed Plaintiff that Plaintiff should either use his annual leave, or take unpaid leave to offset any additional time used to attend religious services.  (Def. 56.1 ¶ 88.)  In his deposition, Plaintiff acknowledged that Alaniz told him he needed to take either unpaid leave or "vacation days."  (St. Juste Dep. 146:13–16.)  In his affidavit in opposition to Defendants' motion for summary judgment, Plaintiff states that Alaniz "insisted" that Plaintiff had to take this time off as

unpaid leave only.  (St. Juste Aff. ¶¶ 62, 100.)  Alaniz never prevented Plaintiff from attending

Friday prayers, and Plaintiff ultimately took unpaid leave to attend religious services on Friday

afternoons.  (Def. 56.1 ¶ 95; Pl. 56.1 ¶ 94; St. Juste Dep. 182:2–7.)

### c.  Plaintiff's Complaints

On May 19, 2009, Plaintiff emailed Harris, stating: "I really need to meet with you in

regards to a meeting I had with [R]icardo [Alaniz], he advised me to speak to you. . . .  It's in

reference to my religion."  (Pl. Ex. 8.)  On June 17, 2009, Plaintiff sent an email to Florentino

expressing concerns about his interactions with Alaniz.  (Def. 56.1 ¶ 96; Pl. 56.1 ¶ 95; Pl. Ex.

13.)  Plaintiff stated in part, "it appeared to me that [Alaniz] was trying to make me choose

between my job and my religion.  [I] even mentioned to him about federal laws to prevent such

incidents from [o]ccurring . . . ."  (Pl. Ex. 13.)  Two days later Plaintiff forwarded a copy of that

email to Barneys and Harris.  (Def. 56.1 ¶ 101; Pl. 56.1 ¶ 100.)

Alaniz met with Harris to discuss Plaintiff's use of additional lunch time to attend

religious services.  (Alaniz Dep. 125:14–125:22.)  Harris recalls giving Alaniz a copy of Metro

Plus's operating procedure manual and explaining to him that he should attempt to accommodate

an employee's needs unless Alaniz believed that such an accommodation would negatively affect

operations.  (Def. Ex. E and Pl. Ex. 7, Deposition of Ryan Harris ("Harris Dep.") 150:3–151:6.)

Harris also warned Alaniz against "singling anybody out."  (*Id*. at 151:5–6.)  Harris also had a

conversation with Plaintiff where he presented him with a copy of the operating procedure

manual and explained that they would attempt to accommodate his needs but it would depend on

the "operational needs of the department."  (Def. 56.1 ¶ 91; Harris Dep. 151:13–151:25.)  Alaniz

confirms that Harris provided him with a copy of the operating procedure but stated that they

mutually concluded that they "could not reasonably accommodate [Plaintiff's] request" for a

longer lunch hour.  (Alaniz Dep. 114:12–17.)

### d.  Plaintiff's disciplinary history

On April 13, 2009, Plaintiff attended a counseling session to discuss his failure to meet his monthly productivity goals from November 2008 through March 2009.[4]  (Def. 56.1 ¶ 66; Pl. 56.1 ¶ 65; Def. Ex. Q Record of Employee Counseling Session ("April 2009 Counseling Memorandum") 1–2, 4)

On August 17, 2009, a counseling memorandum was generated for Plaintiff to discuss excessive unscheduled absences.  (Def. 56.1 ¶ 66; Pl. 56.1 ¶ 65; Pl. Ex. 9, Memorandum Dated Aug. 17, 2009; April 2009 Counseling Memorandum at 3, Undated Record of Employee Counseling Session.)  The memorandum stated that "during the last 3 months [Plaintiff has] . . . exceeded the amount of unscheduled days off allowed by the corporation."  (Memorandum Dated Aug. 17, 2009 at 331.)  Plaintiff wrote on the counseling memorandum, "I was at work. Only one of these days was unscheduled."  (*Id.*)  According to Florentino, the counseling memorandum never became a genuine disciplinary issue because she met with Plaintiff's union representative on an unspecified date and the representative encouraged Plaintiff to produce doctor's notes for all his unscheduled absences, which he did, and "that was the end of it." (Florentino Dep. 62:17–21.)  A counseling session to discuss these unexcused absences was

---

[4]  Counseling is part of Metro Plus's disciplinary process.  (56.1 ¶ 62)  During counseling, management speaks with an employee and the employee's union representative about the employee's performance, attendance or a variety of other issues.  (Florentino Dep. 57:5–12.)  Counseling is followed first by a warning, then a request for disciplinary action, and finally, a request for termination.  (Florentino Dep. 57:20–23.)  It appears from the record that a counseling memorandum is generated to apprise the employee of the situation.  A counseling session is then scheduled between the supervisor, employee and his Union Representative.  After this counseling session, an employee is then provided with the Counseling Record which describes the misconduct, the corrective action plan to fix the misconduct, any additional comments, and the signatures of all involved parties.  (Def. Ex. Q Counseling Record for Plaintiff's April 13, 2009 Counseling.)

scheduled for October 17, 2009,[5] (Pl. Ex. 11 & Def. Ex. Q,), but this counseling session never took place, (Florentino Dep. 61:12–61:14).

### e. Fraud investigation

In or around September 2009, while Florentino was conducting Quality Assurance of Medicaid enrollment documents, she became suspicious of certain Medicaid enrollment documents submitted by Plaintiff. (Def. 56.1 ¶ 103; Florentino Dep. 85–87.) Several of Plaintiff's field applications for Medicaid were "in perfect shape," with no wrinkles or folds, which was atypical of applications from this population. (Florentino Dep. 87:9–23; Def. 56.1 ¶ 104.) Generally, enrollment forms were not "in perfect shape" and tend to have "wrinkles." (Florentino Dep. 87:15–23.) On October 8, 2009, Florentino sent a memorandum to a manager in the Compliance Department, copying, among others, Chasse, Harris and Alaniz, documenting her investigation into the enrollment forms and requesting an investigation into possible fraud by Plaintiff. (Pl. Ex. 12 and Def. Ex. U at 68–70, ("Florentino Mem.") at 68–70.)

In the memorandum Florentino described three enrollment forms from three different clients, produced by Plaintiff, which she believed to be counterfeit. (*Id.*) Florentino described

---

[5] It is not clear whether this counseling session had been automatically generated when Plaintiff received his Counseling Memorandum on August 17, 2009, or if it was subsequently scheduled even after Plaintiff presented doctor's notes for the absences. Plaintiff received the notice to appear at the October 17, 2009 counseling session shortly after receiving the counseling memorandum. (St. Juste Aff. ¶ 74; *see also* Pl. Ex. 11, undated "Record of Employee Counseling Session" scheduled for October 17, 2008 [sic].) Plaintiff's affidavit indicates that the notice to appear, also referred to here as the counseling memorandum, was dated August 17, 2009. (Pl. Ex. 9, St. Juste Aff. ¶ 71.) The record is also unclear as to whether a counseling session with regard to the August 17, 2009 memorandum took place in August 2009. According to Plaintiff, "a counseling session was held on April [sic] 17, 2009 and was dismissed." (St. Juste Aff. ¶ 72). Plaintiff also refers to this incident in Plaintiff's opposition memorandum and at oral argument as a "counseling session" scheduled for August 17, 2009. (*See* Pl. Opp. 8, Tr. 39:23–40:2.) Assuming that a formal or informal counselling session took place on or about August 17, 2009, Plaintiff concedes that the charges were dismissed at that "hearing." (St. Juste Aff. ¶¶ 72–73.)

contacting Plaintiff's clients and confirming that they had not provided the letters that Plaintiff

had submitted with their enrollment forms. (*Id.*) Florentino concluded that Plaintiff "violated

[Facilitated Enroller] provisions by altering eligibility documents and did not adhere to our

Marketing Department operating procedures . . . ." (*Id.*; Florentino Dep. 90:11–90:25.) Alaniz

approved Florentino's memorandum and recommended that she send the matter to the

Compliance Department. (Alaniz Dep. 87:15–88:8.) On October 13, 2009, Florentino submitted

a Suspected Fraud and Abuse Form to the Compliance Department. (Def. 56.1 ¶ 107; Pl. 56.1

¶ 106; Def. Ex. U at 373–376 ("Suspected Fraud and Abuse Form").)

### f. Plaintiff's pre-hearing suspension and disciplinary hearing

On October 16, 2009, a pre-hearing suspension letter was sent to Plaintiff informing him

that he was suspended without pay "effective immediately" until a disciplinary hearing was

scheduled. (Def. 56.1 ¶ 108; Pl. 56.1 ¶ 107; Def. Ex. V.) On October 22, 2009, a Notice of

Statement and Charges was filed and Plaintiff's disciplinary hearing was scheduled for

October 29, 2009 and included a formal list of charges. (Def. 56.1 ¶ 109; Pl. 56.1 ¶ 108; Def.

Ex. W.) Plaintiff was accused of three counts of "gross misconduct" for "altering original

eligibility documents." (Def. Ex. W.)

Plaintiff attended the October 29, 2009 Disciplinary Hearing with his union

representative, Sheila Lewis; Diana Almanzar, a Compliance Analyst, Barneys, Alaniz and

Florentino were also present. (Def. 56.1 ¶¶ 110–14; Pl. 56.1 ¶¶ 109–13.) The hearing was

presided over by Barneys. (Def. 56.1 ¶ 111; Pl. 56.1 ¶ 110.) Almanzar presented evidence of

the fraud charges against Plaintiff. (Def. 56.1 ¶ 114; Pl. 56.1 ¶ 113.) On December 9, 2009,

Barneys issued a determination letter with her findings. (Def. Ex. Y, "Letter of Determination.")

Barneys concluded that one of the three charges of fraud could be substantiated, one could not be

substantiated, and that the letter comprising the third charge was authentic and that charge was therefore unfounded.  (*Id*. at 2–3.)  Barneys recommended that Plaintiff be suspended for sixty days without pay, but since Plaintiff had already "served a 30 calendar day suspension without pay," Plaintiff would receive credit for those 30 days.  (*Id*.)

According to Defendants, the substantiation of the fraud charge was grounds for terminating Plaintiff, but because Plaintiff's union representative had spoken with Barneys after the October 22, 2009 disciplinary hearing and recommended leniency, Barneys recommended a 60-day suspension rather than termination of Plaintiff's employment.  (Def. 56.1 ¶ 116; Def. Ex. H, Deposition of Belinda Barneys at 64:17–65:22.)  Plaintiff's union representative Sheila Lewis informed him that, as a condition of his suspension and reinstatement, rather than termination, he would have to plead guilty to the one charge of fraud that had been substantiated by Barneys.  (Def. 56.1 ¶ 118; Pl. 56.1 ¶ 117.)  Plaintiff told Lewis that he would do so only under "duress." (St. Juste Dep. 112.)  Plaintiff maintains that he never admitted guilt or conceded that the substance of the fraud charge was accurate.  (St. Juste Aff. ¶ 79.)  Plaintiff alleges that the fraud charges against him were fabricated by Florentino and Alaniz.  (St. Juste Aff. ¶ 80.)  He asserts that "it was Florentino who had at one time asked me to forge certain documents and that I refused to do so."  (St. Juste Aff. ¶ 80; *see also* Am. Compl. ¶ 38.)

A Stipulation of Settlement ("Stipulation"), dated January 11, 2010, stated the terms of Plaintiff's reinstatement.  (Def. Ex. Z.)  The terms of the Stipulation included an acknowledgment that the Plaintiff "pleads no contest and accepts the disciplinary penalty of a suspension without pay of thirty (30) days." [6]  (Stipulation at 2.)  Plaintiff's union representative

_____

[6]  According to Plaintiff, one of the elements of his reinstatement was that he no longer wear his *thawb*,  (St. Juste Aff.  ¶ 93), although this does not appear in the Stipulation.  Plaintiff

signed the Stipulation on April 21, 2010, (*id.* at 4), but Plaintiff never signed it because he was never provided with a copy, (St. Juste Aff. ¶¶ 86, 87; St. Juste Dep. 112:21–22; Stipulation at 4). Although Plaintiff never signed the Stipulation, he was aware of the conditions of his reinstatement and that he was accepting the terms of the Stipulation. (Pl. Dep. 118:12–19.)

### g. Plaintiff's reinstatement

Plaintiff was reinstated in December 2009 and transferred to a team in the Bronx, where he worked under the supervision of Regina Joseph. (Def. 56.1 ¶¶ 130–31; Pl. 56.1 ¶¶ 129–30.) Plaintiff was happy to be out from under the supervision of Alaniz and Florentino but wanted to continue working in Brooklyn, where he lived. (St. Juste Dep. 196:2–8.) Metro Plus informed Plaintiff that there was no availability on any of the Brooklyn teams. (*Id.* at 196:16–22.) Plaintiff was unaware if there was any available space on any of the Brooklyn teams. (*Id.* at 196:7–9.) Chasse directed Plaintiff to speak with the supervisors of various Brooklyn teams to determine if they had space. (Def. Ex. F, Deposition of Joseph Chasse ("Chasse Dep.") 60:25–61:8.) Chasse states that Plaintiff was not transferred to one particular team in Brooklyn because that team required special language skills that Plaintiff did not have, and that another team at Kings County Hospital was full. (Chasse Dep. 60:3–18; Def. 56.1 ¶ 137.) While at the Bronx site, Plaintiff received a counseling memorandum from Joseph for his low enrollment numbers. (Def. 56.1 ¶ 138; Pl. 56.1 ¶ 137.)

### h. Plaintiff's security incident

Plaintiff believes that he was blacklisted from all North Brooklyn Metro Plus work sites. On February 9, 2010, Joseph sent an email to her employees informing the employees that due to an upcoming snow storm, they could work from any Metro Plus work site in close proximity to

---

states that after his reinstatement, his faith in Metro Plus was so diminished that he did not try to fight this edict. (St. Juste Dep. 182:15–22.)

their home.  (Pl. Ex. 18 at 322.)  Plaintiff went to Woodhull Hospital, the closest work site to his

home, but he was denied entrance and forced to travel to the Bronx.  (St. Juste Aff. ¶ 16.)  A few

days later on February 11, 2010, Alaniz sent an email to Joseph, Chasse, Florentino and Plaintiff

stating that it was "not acceptable" for Plaintiff to work at Woodhull Hospital because he

represented a "security concern."  (Pl. Exs. 19, 22.)  Florentino also sent an email on

February 11, 2010, stating that Plaintiff "cannot report to Woodhull or any other site in the North

Brooklyn network.  Hospital police will not allow him on the premises."  (Pl. Ex. 22.)  Alaniz

was not aware of any policy that prohibited Plaintiff from working from any other North

Brooklyn hospital other than Woodhull Hospital.  (Alaniz Dep. 171:13–17.)  Alaniz's supervisor,

Chasse, stated that there was no policy that prohibited Plaintiff from working anywhere in

Brooklyn.  (Chasse Dep. 113:8–10, 114:8–23.)  Florentino agreed that "after [Plaintiff] was

reinstated, he had access to all sites because he was an employee."  (Florentino Dep. 193:13–24.)

## II.  Discussion

### a.  Standard of Review

Summary judgment is proper only when, construing the evidence in the light most

favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Bronzini v. Classic

Sec., L.L.C.*, --- F. App'x ---, ---, 2014 WL 943933 (2d Cir. Mar. 12, 2014); *Kwan v. Andalex

Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013); *Kwong v. Bloomberg*, 723 F.3d 160, 164–65 (2d

Cir. 2013).  The role of the court is not "to weigh the evidence and determine the truth of the

matter but to determine whether there is a genuine issue for trial." *Cioffi v. Averill Park Cent.

Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 162 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby,

Inc.*, 477 U.S. 242, 249 (1986)). A genuine issue of fact exists when there is sufficient "evidence

on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.  The

"mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment; "there

must be evidence on which the jury could reasonably find for the plaintiff." *Id.*  The court's

function is to decide "whether, after resolving all ambiguities and drawing all inferences in favor

of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins.

Co.*, 221 F.3d 394, 398 (2d Cir. 2000). The Second Circuit has "cautioned that [w]here an

employer acted with discriminatory intent, direct evidence of that intent will only rarely be

available, so affidavits and depositions must be carefully scrutinized for circumstantial proof

which, if believed, would show discrimination." *Taddeo v. L.M. Berry & Co.*, 526 F. App'x. 121,

122 (2d Cir. 2013) (quoting *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir.

2010)).

### b.   City of New York

Plaintiff names the City of New York as a separate Defendant.  However, Plaintiff has

not made any allegations against the City of New York or its agencies.  Instead, Plaintiff has

made allegations against Metro Plus, a subsidiary of HHC.  It is well-established that for the

purposes of Title VII litigation, HHC and the City of New York are considered two distinct

entities.  Where, as here, there are no allegations against the City of New York or any of its

agencies but rather against HHC, a separate entity, the City of New York has improperly been

named as a Defendant to this suit.  *See Samuel v. Bellevue Hosp. Ctr.*, 366 F. App'x 206, 206

n.** (2d Cir. 2010) ("New York City Health and Hospitals Corporation[] is separate and distinct

from the City of New York." (citing *Brennan v. City of New York*, 59 N.Y.2d 791, 792 (1983));

*Woodard v. New York Health & Hospitals Corp.*, No. 04-CV-5297, 2010 WL 2735757, at *7

(E.D.N.Y. July 9, 2010) ("most Title VII cases have reached the conclusion that despite the fact

that HHC employees are entitled to indemnification and representation by the City, HHC and the

City are separate entities with separate employees"); *Springer v. City of New York*, No. 01-CV-4392, 2006 WL 526028, at *9 (E.D.N.Y. March 3, 2006) (finding no identity of interests between HHC and the City in a Title VII case); *Centeno v. New York City*, No. 02-CV-2745, 2005 WL 1126811, at *4 n.5 (E.D.N.Y. May 12, 2005) (explaining, in dicta, that "the City of New York is not plaintiff's employer and cannot be held liable in this Title VII action [because] [t]he City of New York and the Health and Hospitals Corporation are separate legal entities"). The City of New York is not a proper party, and the Court therefore dismisses the City of New York from this action.

### c. Florentino, Alaniz and Stocker

Plaintiff asserts a Title VII claim against Florentino, Alaniz and Michael Stocker, the Chairman of the Board of HHC. Under Title VII, a Plaintiff cannot name individuals as defendants because Title VII liability can only be imputed to an employer and not to an individual employee. *See Sassaman v. Gamache*, 566 F.3d 307, 315–16 (2d Cir. 2009) ("individuals are not subject to liability under Title VII" (quoting *Patterson v. Cnty of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004))); *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1313 (2d Cir. 1995) ("individual defendants with supervisory control over a plaintiff may not be held personally liable under Title VII"). Thus Florentino, Alaniz and Stocker are improperly named Defendants to Plaintiff's Title VII suit and Plaintiff's Title VII claims against Florentino, Alaniz and Stocker are dismissed.

Although "Title VII claims are not cognizable against individuals, individuals may be held liable under . . . [§ ] 1983 for certain types of discriminatory acts, including those giving rise to a hostile work environment." *Patterson*, 375 F.3d at 226 (citing *Hayut v. State Univ. of New York*, 352 F.3d 733, 753–54 (2d Cir. 2003)) (additional citation omitted); *see also Patterson*, 375

F.3d at 230 ("[G]enerally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." (quoting *West v. Atkins*, 487 U.S. 42, 49–50 (1988)). A plaintiff however, "must establish a given defendant's personal involvement in the claimed violation in order to hold that defendant liable in his individual capacity under § 1983." *Id.* at 229. In this case, as discussed below, Plaintiff's allegations of discrimination, retaliation, and a hostile work environment revolve almost entirely around the actions of Alaniz. Therefore Plaintiff has sufficiently alleged Alaniz's personal involvement. Similarly, the disciplinary charges which led to Plaintiff's suspension were initiated by Florentino. Plaintiff has therefore sufficiently alleged Florentino's personal involvement. *See Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 123 (2d Cir. 2004) ("There is little doubt that [school district employee defendants] were 'personally involved' in the purported deprivation, or that they acted under the color of state law when they recommended against Back's tenure and evaluated her negatively."). Plaintiff alleges that Stocker, as Chairman of the Board of HHC, "knew or should have known of the discriminatory customs, practices and wrongful acts of the defendants described in this complaint and condoned, ratified and/or authorized." (Am. Compl ¶ 9.) However, Plaintiff did not argue and the record does not establish that Stocker had any personal involvement in any of the alleged violations. Accordingly, Stocker is improperly named as a defendant as to Plaintiff's § 1983 claims and all § 1983 claims against him are dismissed.

**d.    Religious Discrimination Claims — Title VII, Section 1983 and NYSHRL**

Plaintiff alleges that Defendants discriminated against him on the basis of his religion in violation of Title VII, § 1983 and NYSHRL. Title VII makes it unlawful for an employer "to fail or refuse to hire or discharge any individual, or otherwise to discriminate against any individual .

. . because of such individual's . . . religion[.]" 42 U.S.C. § 2000e–2(a)(1). An individual's "religion" includes not just religious beliefs, but "all aspects of religious observance and practice," unless the employer demonstrates that it is unable to reasonably accommodate that observance or practice "without undue hardship on the conduct of the employer's business." § 2000e(j); *see also Cosme v. Henderson*, 287 F.3d 152 (2d Cir. 2002) (stating that "Congress delineated the scope of an employer's duties . . . by defining 'religion' in a substantively significant way"); *Siddiqi v. N.Y. Health & Hospitals Corp.*, 572 F. Supp. 2d 353, 369 (S.D.N.Y. 2008) ("Courts interpret [42 U.S.C. § 2000e(j)] to mean that an employer cannot discriminate against any employee on the basis of the employee's religious beliefs unless the employer shows that he cannot reasonably accommodate the employee's religious needs without undue hardship on the conduct of the employer's business." (citations and internal quotation marks omitted)). Thus, "[a] plaintiff may claim a violation of religious discrimination under Title VII under theories of either disparate treatment or denial of reasonable accommodation." *Bind v. City of New York*, No. 08-CV-11105, 2011 WL 4542897, at *9 (S.D.N.Y. Sept. 30, 2011) (citing *Feingold v. New York*, 366 F.3d 138, 149 (2d Cir. 2004) (disparate treatment) and *Cosme*, 287 F.3d at 158 (denial of reasonable accommodation)). Plaintiff has alleged religious discrimination under both disparate treatment and failure to accommodate.

### i. Disparate Treatment Religious Discrimination Claim

Under Title VII, § 1983 and the NYSHRL, disparate treatment religious discrimination claims are assessed using the burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, (1973).[7] *See e.g.*, *Marmulszteyn v. Napolitano*, 523 F. App'x 13,

---

[7] The burden of proof and production for employment discrimination claims under Title VII and the NYSHRL are identical. *Hyek v. Field Support Servs., Inc.*, 461 F. App'x 59, 60 (2d Cir. 2012) ("Claims brought under the NYSHRL 'are analyzed identically' and 'the outcome of

15 (2d Cir. 2013) (explaining that a "disparate-treatment claim" based on religion "is governed by the familiar burden-shifting framework set forth in *McDonnell Douglas*"). Under the framework, a plaintiff must first establish a *prima facie* case of discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993); *see also Dowrich-Weeks v. Cooper Square Realty, Inc.*, 535 F. App'x 9, 11 (2d Cir. 2013); *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010); *Weber v. City of New York*, --- F. Supp. 2d ---, ---, 2013 WL 5416868, at *13 (E.D.N.Y. Sept. 29, 2013) (explaining the burden shifting analysis for religious discrimination claims). The plaintiff's burden at this stage is "minimal." *Holcomb v. Iona Coll.*, 521 F.3d 130, 139 (2d Cir. 2008) (quoting *Hicks*, 509 U.S. at 506). If the plaintiff satisfies this initial burden, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. *Hicks*, 509 U.S. at 506–07; *Ruiz*, 609 F.3d at 492. The defendant's burden "is not a particularly steep hurdle." *Hyek v. Field Support Servs.*, 702 F. Supp. 84, 93 (E.D.N.Y. 2010). It "is one of

---

an employment discrimination claim made pursuant to the NYSHRL is the same as it is under . . . Title VII.'" (alteration in original) (quoting *Smith v. Xerox Corp.*, 196 F.3d 358, 363 n.1 (2d Cir. 1999))). Therefore, Plaintiff's Title VII and NYSHRL discrimination claims are analyzed together for purposes of this motion. Plaintiff asserts a § 1983 claim, but does not specify which of his constitutional rights Defendants have violated. Section 1983 is not a freestanding source of substantive rights, but rather the vehicle through which Plaintiff may bring a cause of action alleging a deprivation of a federal constitutional right by a state actor. *Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 225 (2d Cir. 2004) ("Section 1983 'is not itself a source of substantive rights.' It merely provides 'a method for vindicating federal rights elsewhere conferred . . . .'" (citing *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). In the context of employment discrimination, § 1983 claims are generally asserted as claims against public employers for violations of the Equal Protection Clause of the Fourteenth Amendment and are analyzed identically to claims of employment discrimination brought pursuant to Title VII. *See Chick v. Cnty. of Suffolk*, --- F. App'x ---, ---, 2013 WL 6332682, at *1 (2d Cir. Dec. 6, 2013) ("Section 1983 employment discrimination claims asserted as equal protection violations are evaluated under the same standards as Title VII claims."); *see also Reynolds v. Barrett*, 685 F.3d 193, 202 (2d Cir. 2012) (clarifying that, under Second Circuit law, individual claims of discrimination under § 1983 are subject to either the *McDonnell Douglas* framework or a hostile work environment analysis)). Defendants discuss the § 1983 claim as identical to the Title VII and NYSHRL claim, applying the *McDonnell-Douglas* burden-shifting analysis. (Def. Mem. 3.) The Court treats it similarly.

production, not persuasion; it 'can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (quoting *Hicks*, 509 U.S. at 509). "If the employer is able to satisfy that burden, the inquiry then returns to the plaintiff, to demonstrate that the proffered reason is a pretext for discrimination." *United States v. City of New York*, 717 F.3d 72, 102 (2d Cir. 2013). To defeat summary judgment at this stage, "a plaintiff need only show that the defendant was in fact motivated at least in part by the prohibited discriminatory animus." *Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 156 (2d Cir. 2010); *see also Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. ---, ---, 133 S. Ct. 2517, 2522–23 (2013) ("An employee who alleges status-based discrimination under Title VII . . . [must] show that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision.").

### 1. *Prima Facie* Case

To establish a *prima facie* case of religious discrimination based on disparate treatment, a plaintiff must show that: "(1) he belonged to a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012); *see also Marmulszteyn*, 523 F. App'x at 15 (listing elements of plaintiff's *prima facie* case in the context of religious discrimination disparate treatment claim) (quoting *Ruiz*, 609 F.3d at 492)).

Defendants do not dispute that Plaintiff, as a Muslim, is a member of a protected class. (Def. 56.1 ¶ 1; Pl. 56.1 ¶ 1.) *See Jiggetts v. Laguardia Airport*, No. 04-CV-3969, 2007 WL 1026409, at *5 (E.D.N.Y. Mar. 30, 2007) ("As a Muslim man of African-American descent . . . , Jiggetts satisfies the protected class" element of his Title VII claim.). Defendants assume that

Plaintiff was qualified to serve as a Medicaid ESR for Metro Plus. (Def. Mem. 4.) To satisfy this element a plaintiff must "show only that he possesses the basic skills necessary for performance of the job." *See Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 92 (2d Cir. 2001) (alteration, citations and internal quotation marks omitted)). Defendants argue that the actions identified by Plaintiff were not adverse employment actions, and that they did not occur under circumstances giving rise to an inference of discrimination. (Def. Mem. 4; Def. Reply 5.) The Court discusses both of these elements below.

## A. Adverse Employment Action

Plaintiff alleges the following constitute adverse employment actions: (1) the termination of the use of compensatory time to attend Friday prayers, (Pl. Mem. 8), (2) Plaintiff's suspension in connection with fraud charges, (Pl. Mem. 9–10; Transcript of Oral Argument ("Tr.") 48:6–7), (3) the termination of the Masjid-At-Taqwa as an enrollment site, (Pl. Mem. 7-8; Tr. 33:6–9), (4) the generation of a counseling memorandum and counseling session on August 17, 2009 regarding excessive unscheduled absences,[8] (Pl. Opp. 8; Tr. 39:23–40:2), and (5) Plaintiff's transfer to the Bronx after he was reinstated, (Pl. Mem. 10; Tr. 48:21–49:4).

The Second Circuit has made clear that an "[a]n adverse employment action is a materially adverse change in the terms and conditions of employment." *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008) (emphasis omitted). Such action must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Brown*, 673 F.3d at 150 (2d Cir. 2012) (quoting *Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir. 2006)); "Examples of materially adverse employment actions include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits,

---

[8] The Court assumes that a counseling session did take place on August 17, 2009, in which the charges against Plaintiff were dropped. *See* St. Juste Aff. ¶¶ 72–73.

significantly diminished material responsibilities, or other indices unique to a particular situation." *Feingold*, 366 F.3d at 152 (alteration, citation and internal quotation marks omitted). As discussed below, Plaintiff has met his burden at the *prima facie* stage of showing that his suspension without pay in October 2009 and the termination of his ability to use compensatory time to attend Friday prayers were adverse employment action for purposes of his disparate treatment discrimination claim.

### (1)   Termination of use of compensatory time

Plaintiff argues that Alaniz's termination of the use of compensatory time was an adverse action.  Plaintiff had an informal agreement with Florentino that he could take an extra 30 minutes to attend Friday prayers, without documenting the time on his time sheet, in exchange for working an extra 30 minutes after hours.  When Alaniz became Plaintiff's supervisor in April 2009 and learned of this arrangement, he terminated it, and told Plaintiff that he should either use annual leave or unpaid time to account for the extra 30 minutes each Friday, although in his affidavit in opposition to the motion, Plaintiff claims that Alaniz told him that he had to use unpaid leave.  Alaniz also emailed Plaintiff a copy of HHC's Operating Procedure policy regarding leave for ethnic and religious holidays, told Plaintiff that he would make a genuine effort to accommodate Plaintiff's needs and directed Plaintiff to contact the director of labor relations if he had any questions.

Plaintiff argues that these events establish that Alaniz prevented Plaintiff from using compensatory time to attend Friday prayer.  The record is devoid of detail as to whether Plaintiff read the HHC operating policy regarding leave for religious observances and subsequently made a formal request to take compensatory leave that was denied by Alaniz.  Nor is there evidence that Alaniz pre-emptively told Plaintiff not to bother making such a request.  However, viewing the evidence in the light most favorable to the Plaintiff, a reasonable jury could credit Plaintiff's

last recollection that Alaniz insisted that Plaintiff use only unpaid leave, or find that by failing to verbally inform Plaintiff that he had the right to use compensatory leave, Alaniz denied Plaintiff the ability to use compensatory leave to attend Friday prayers. Plaintiff took the time off each week as unpaid leave for a period of two to three months, although the parties dispute whether he did so by choice or because Alaniz "insisted" that it be documented as unpaid leave.

With this view of the record, in light of the fact that Plaintiff was not paid for approximately 30 minutes that he took off for religious observances on Friday afternoons, for a period of two to three months, the termination of Plaintiff's ability to use compensatory time had a materially adverse impact on Plaintiff sufficient to establish an adverse employment action. *See Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (noting that a materially adverse employment action must have an impact on "some tangible job benefits such as compensation, terms, conditions or privileges of employment" (citation and internal quotation marks omitted)); *see also Ebanks v. New York City Dep't of Envt'l Prot.*, No. 05-CV-3172, 2009 WL 891796, at *4 (E.D.N.Y. Mar. 31, 2009) (finding that "failure to authorize overtime and/or compensatory time" was an adverse employment action).

### (2) Suspension resulting from charges of fraud

Plaintiff's October 2009 suspension without pay is an adverse employment action. *See Weber*, --- F. Supp. 2d at ---, 2013 WL 5416868, at *14 (finding that initiation of disciplinary charges culminating in 60-day suspension without pay was an adverse employment action); *Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 348, 355–56 (S.D.N.Y. 2006) ("Plaintiff's ten-day suspension [without pay] is an adverse employment action, as it is a material alteration of Plaintiff's working conditions."); *McPhatter v. New York City*, No. 06-CV-1181, 2009 WL 2412980, at *5 (E.D.N.Y. July 30, 2009) ("Suspension without pay is, indeed, ordinarily an

adverse employment action." (citing *Lovejoy–Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223 (2d Cir. 2001)), *aff'd*, 378 F. App'x 70 (2d Cir. 2010).

### (3)   Discontinuation of mosque as enrollment site

Plaintiff alleges that the discontinuation of Masjid-At-Taqwa as an enrollment site constitutes an adverse employment action, because it had an adverse impact on Plaintiff's ability to enroll new participants in Medicaid, thereby affecting his productivity.  (Pl. Mem. 16; Tr. 33:11–13.)  Defendants argue that the discontinuation of the use of the mosque as an enrollment site amounts to nothing more than Plaintiff's "subjective dissatisfaction" with his job assignment.  (Def. Reply 6.)  As evidence that the mosque had been productive and that its discontinuation therefore adversely affected Plaintiff's ability to enroll new participants, Plaintiff relies on the fact that the mosque had been open for a period of ten months prior to Alaniz's decision to discontinue it as an enrollment site, four months longer than the initial period required for an enrollment site to be considered productive according to Plaintiff.  (Tr. 38:22–39:6.)  Plaintiff's argument that the mosque must have been productive because it was open for ten months, without any evidence showing the productivity of the mosque, is speculative. Plaintiff does not present any evidence of the number of people he enrolled at the mosque during the time he worked at that location in support of his claim that it was productive.  Plaintiff instead points to his performance evaluation for 2008–09, which shows the total number of participants enrolled by Plaintiff in each month between October 2008 and September 2009. (Def. Ex. R at 55.)  However, this evaluation does not specify the location where Plaintiff recruited these individuals, nor does it indicate any specific number of individuals Plaintiff enrolled from the mosque site.[9]  Plaintiff also refers to the testimony of Joseph, his supervisor in

---

[9]   Even assuming that the mosque was discontinued in mid-April and any change in Plaintiff's total enrollment numbers before and after the discontinuation could be attributed

the Bronx, who testified that she and her supervisor were willing to resume using the mosque as a site for enrollment, because they believed that Plaintiff "had good community standing," and it might "get numbers for [Plaintiff] and increase his productivity," (Joseph Dep. 51:18–25), and the fact that the mosque was in fact reinstated as an enrollment site subsequent to his transfer to the Bronx, (Joseph. Aff. ¶ 43), to argue that the mosque was always productive. The testimony of Plaintiff's supervisor in the Bronx, that she was preparing to resume recruitment at the mosque "to help the community," and to help Plaintiff "increase his productivity," provides no support for Plaintiff's claim that the mosque was productive at the time it was closed. Plaintiff also argues that Defendants have not presented any evidence to demonstrate that the mosque was not productive, but instead have only said that it was not. Plaintiff misplaces the burden of production at this *prima facie* stage on Defendants. The absence of evidence in the record showing the productivity of the mosque and connecting that productivity to Plaintiff's productivity prevents Plaintiff from demonstrating that Alaniz's discontinuance of the mosque as an enrollment site had a materially adverse impact on the terms and conditions of Plaintiff's employment. Although Plaintiff's burden at the *prima facie* stage is "minimal," without any evidence showing that the mosque was productive or linking a decrease in Plaintiff's

---

entirely to its discontinuance, Plaintiff's evaluation presents at best a mixed picture. The total number of individuals recruited by Plaintiff in the months prior to May 2009 decreased from an average of 41 members in gross during the seven months prior to May 2009, to an average of 35 members in gross during the five months beginning in May 2009. However, that same comparison shows that Plaintiff's "net" enrollment figures *increased* from 28 members to 35 for those same time periods. Plaintiff offers no interpretation for these figures, but they undermine Plaintiff's argument that the closing of the mosque as a recruitment site adversely affected his productivity. More importantly, Plaintiff does not explain the number of enrollments that could have been attributable to the mosque location. While the evaluation indicates that Plaintiff organized two events at the mosque in early 2009, it does not show whether he recruited any individuals or otherwise improved his productivity as a result of those events.

productivity to the discontinuation of the mosque as an enrollment site, Plaintiff cannot meet even this minimal burden to show that the discontinuance harmed him materially.

### (4)    Counseling memorandum for sick days

Plaintiff argues that the notice he received on August 17, 2009, requiring him to appear for a counseling session constitutes an adverse employment action because it is the first step in the disciplinary process, and it remains on Plaintiff's record.  (Pl. Mem. 8 (citing Harris Dep. 98–99).)  Plaintiff emphasizes that "the basis for the 'excessive unscheduled days taken' was simply fabricated."  (Pl. Mem. 9.)  However, even if Plaintiff is correct that the counseling memorandum was unjustified, such a counseling memorandum, standing alone, does not constitute an adverse employment action.  *See Morales v. NYS Dep't of Labor*, 865 F. Supp. 2d 220, 244 (N.D.N.Y. 2012) ("Consequently, the issuance of a counseling memorandum and a notice of discipline, without any further evidence regarding a materially adverse effect thereof, is not an adverse employment action as a matter of law."), *aff'd*, 530 F. App'x 13 (2d Cir. 2013); *see also Risco v. McHugh*, 868 F. Supp. 2d 75, 113 (S.D.N.Y. 2012) ("The preparation of two counseling memoranda . . .  is insufficient to establish a materially adverse action as a matter of law."); *Williams v. New York City Hous. Auth.*, 335 F. App'x 108, 110 (2d Cir. 2009) (issuance of two counseling memoranda does not constitute an adverse employment action); *Stoddard v. Eastman Kodak Co.*, 309 F. App'x 475, 479 (2d Cir. 2009) (holding that counseling memorandum could not be considered an adverse employment action absent evidence that it resulted in any alteration of plaintiff's working conditions or job responsibilities).

Although the record is unclear as to whether the memorandum generated on August 17, 2009 resulted in a counseling session in August 2009 (in addition to the counseling session scheduled for October 17, 2009), even if such a session had been held, according to Plaintiff the charges were dropped at that session.  In the absence of any resulting discipline, the issuance of a

counseling memorandum or even attendance at a counseling session is not an adverse

employment action as there is no evidence that this had a materially adverse effect on Plaintiff's

employment.

### (5)   Transfer to the Bronx

Plaintiff's transfer from a Brooklyn work site to a Bronx site upon his reinstatement after

his suspension was not an adverse employment action.  Nor was Defendant's failure to transfer

him back to Brooklyn.  While a "nominally lateral transfer, even without any loss in salary, can

constitute an adverse employment action under Title VII," the plaintiff must "show that the

transfer created a materially significant disadvantage."  *Pacheco v. New York Presbyterian*

*Hosp.*, 593 F. Supp. 2d 599, 617 (S.D.N.Y. 2009) (quoting *de la Cruz v. New York City Human*

*Res. Admin. Dep't of Soc. Servs*., 82 F.3d 16, 21 (2d Cir. 1996) and *Galabya v. New York City*

*Bd. of Educ.*, 202 F.3d 636, 641 (2d Cir. 2000))); *see Lore v. City of Syracuse*, 670 F.3d 127, 170

(2d Cir. 2012) ("A lateral transfer that does not result in a reduction in pay or benefits may be an

adverse employment action so long as the transfer alters the terms and conditions of the

plaintiff's employment in a materially negative way." (quoting *Patrolmen's Benevolent Assoc. v.*

*City of New York*, 310 F.3d 43, 51 (2d Cir. 2002)))); *Moore v. Metro. Transp. Auth.*, --- F. Supp.

2d ---, ---, 2013 WL 4757527, at *11 (S.D.N.Y. Aug. 22, 2013) (A transfer denial is adverse

when 'the sought for position is materially more advantageous than the employee's current

position, whether because of prestige, modernity, training opportunity, job security, or some

other objective indicator of desirability.'" (quoting *Beyer*, 524 F.3d at 165)).

Plaintiff was transferred to the Bronx after he was investigated and suspended for fraud

while working at Woodhull Hospital in Brooklyn.  Plaintiff did not want to continue working

under Florentino and Alaniz at Woodhull Hospital.  (Def. 56.1 ¶ 135; Pl. 56.1 ¶ 135.)  Plaintiff

has not proffered evidence to demonstrate that his transfer to the Bronx "alter[ed] the terms and

conditions of [his] employment in a materially negative way." *See Ayiloge v. City of New York*, No. 00-CV-5051, 2002 WL 1424589 at *10 (S.D.N.Y. June 28, 2002) ("The materiality of a transfer cannot be demonstrated where a plaintiff offers no evidence, save his own unsupported, conclusory statements, that his new position is any less prestigious or that his duties have been significantly altered." (citation and internal quotation marks omitted)) *Cf. Lore*, 670 F.3d at 171 (transfer from office of the chief of police to uniformed community relations position adverse employment action for purposes of employment discrimination claim, as the change connoted a considerable reduction in prestige). Rather, Plaintiff argues that the placement in the Bronx location, the furthest possible location from Plaintiff's home, made it difficult for him to get to work. (Tr. 50:14–17.) However, an increase in commute time, by itself, while inconvenient, is insufficient to show that a transfer has had a materially adverse impact. *See Smalls v. Allstate Ins. Co.*, 396 F. Supp. 2d 364, 371 (S.D.N.Y. 2005) (finding that a transfer resulting in a longer commute "an inconvenience, not an adverse employment action" (citing *Galabya*, 202 F.3d at 640)). Although the transfer required extra travel time for Plaintiff, it is not an adverse employment action.

Defendants' failure to transfer Plaintiff back to Brooklyn is also not an adverse employment action. Plaintiff requested to be transferred to an office in Brooklyn but was told that none were available. A denial of a lateral transfer is not an adverse employment action. *See Taylor v. New York City Dep't of Educ.*, No. 11-CV-3582, 2012 WL 5989874, at *7 (E.D.N.Y. Nov. 30, 2012) (finding that denial of request for transfer that would have reduced plaintiff's daily commute by more than four hours not adverse, where there was no evidence "that the transfer would have offered her materially different terms and conditions of employment, such as more money, prestige, or authority"); *Charles v. Connecticut, Judicial Branch, Ct. Support*

*Servs. Div.*, 556 F. Supp. 2d 123, 128 (D. Conn. 2008) (finding that employer's decision not to transfer plaintiff from the Milford office to the New Haven office was not adverse employment action); *Pimentel v. City of New York*, No. 00-CV-326, 2002 WL 977535, at *4 (S.D.N.Y. May 14, 2002) (holding that denial of request for a lateral transfer from Manhattan to Brooklyn office not an adverse employment action), *aff'd*, 74 F. App'x 146 (2d Cir. 2003). Accordingly, neither Plaintiff's transfer to the Bronx, nor the failure of Defendants to transfer him back to an office in Brooklyn, was a materially adverse action for purposes of Plaintiff's discrimination claim.

In sum, the termination of Plaintiff's ability to use compensatory time to attend Friday prayers, and Plaintiff's suspension without pay in October 2009 qualify as materially adverse employment actions for purposes of his disparate treatment religious discrimination claim.

### B. Inference of Discrimination

Inference of discrimination "is a 'flexible [standard] that can be satisfied differently in differing factual scenarios.'" *Howard v. MTA Metro–N. Commuter R.R.*, 866 F. Supp. 2d 196 (S.D.N.Y. 2011) (quoting *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996)); *see also Moore*, No. 11-CV-3625, 2013 WL 3968748, at *6 (same). "No one particular type of proof is required to show that Plaintiff's termination occurred under circumstances giving rise to an inference of discrimination." An inference of discrimination can be drawn from circumstances such as "the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's [adverse employment action]." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001) (quoting *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994)); *see also Abdul-Hakeem v. Parkinson*, 523 F. App'x 19, 20 (2d Cir. 2013)

(finding that an inference of discrimination can be raised by "showing that an employer treated [an employee] less favorably than a similarly situated employee outside his protected group" (quoting *Ruiz*, 609 F.3d at 493)); *Russell v. Cnty. of Nassau*, 696 F. Supp. 2d 213, 232 (E.D.N.Y. 2010) ("a discriminatory race and/or color motive can be inferred if a plaintiff was treated differently than similarly situated white employees or if the defendants engaged in a pattern of discriminatory treatment of African-American employees" (citing *Abdu-Brisson*, 239 F.3d at 468 and *Johnson v. Cnty. of Nassau*, 480 F. Supp. 2d 581, 597 (E.D.N.Y. 2007))).

However, a plaintiff's own subjective belief that he was discriminated against because of his religion is insufficient to sustain a religious discrimination claim. *See Boyar v. City of New York*, No. 10-CV-65, 2010 WL 4345737, at *4 (S.D.N.Y. Oct. 28, 2010) (finding that "[w]hile [the plaintiff] states his belief that his religion played a role in these decisions, personal belief is insufficient to defeat defendants' summary judgment motion" on plaintiff's discrimination claim (citation and internal quotation marks omitted)); *Sicular v. N.Y.C. Dep't of Homeless Servs.*, No. 09-CV-0981, 2010 WL 423013, at *19 (S.D.N.Y. Feb. 4, 2010) (finding that the plaintiff's "personal belief . . . that his being Jewish played into the prejudices of the individual defendants and reinforced their animosity against him is insufficient to defeat defendants' summary judgment motion."), *report and recommendation adopted*, No. 09-CV-0981, 2010 WL 2179962 (S.D.N.Y. May 28, 2010), *aff'd*, 455 F. App'x 129 (2d Cir. 2012).

Plaintiff's burden at this stage of the *prima facie* case is to show that the adverse employment actions he experienced took place under circumstances giving rise to an inference of discrimination. *See Marmulszteyn*, 523 F. App'x at 15 (listing fourth element of plaintiff's *prima facie* showing as "the adverse action took place under circumstances giving rise to the inference of discrimination" (quoting *Ruiz*, 609 F.3d at 492)).

Here, the termination of Plaintiff's use of compensatory time to attend Friday prayers and Plaintiff's suspension without pay as a result of disciplinary charges are adverse employment actions. Plaintiff argues that when Alaniz's actions are viewed collectively, an inference of discrimination can be drawn based on the numerous negative actions that Alaniz took with respect to the mosque and the fact that Plaintiff is Muslim. (Tr. 51:5–10.) Plaintiff's argument is that an inference of discrimination can be drawn from the combined facts of: Alaniz refusing to permit Plaintiff to arrive late to a meeting on April 3, 2009, Alaniz's verbal remarks that Plantiff's *thawb* was "unprofessional according to American culture," and remarks that Plaintiff's attendance at Friday prayers was subject to Alaniz's discretion and was "stealing company time," Alaniz looking for Plaintiff at Plaintiff's station at a time that he knew Plaintiff was attending Friday prayers, Alaniz's discontinuance of the use of compensatory time by Plaintiff to attend Friday prayers, the initiation of a counseling session based on unscheduled absences that Plaintiff alleges were "fabricated" by Alaniz, and the initiation of fraud charges against Plaintiff that Plaintiff likewise alleges were fabricated by Florentino, at Alaniz's urging.

The evidence before the Court does not support the inference that Alaniz's conduct was motivated by Plaintiff's religion. Moreover, even assuming that it did, there is no evidence that Alaniz's bias was a cause of Plaintiff's 60-day suspension without pay as a result of the charges of fraud, or affected his decision to terminate Plaintiff's enjoyment of compensatory time to attend Friday prayers. *See Taddeo*, 526 F. App'x at 123 (the "factual dispute at issue [in evaluating inference of discrimination] is whether a discriminatory animus *motivated* the employer, not whether the employer is wise, shrewd, prudent, or competent" (citation omitted)).

Viewing all of Alaniz's conduct and statements together, the picture that emerges is of a manager with a "hard knock" managerial style that, in Plaintiff's own words, "made a very

uncomfortable work environment for everyone." (*See* Pl. Ex. 13; Tr. 59:22) Plaintiff contends

that Alaniz's refusal to permit Plaintiff to arrive late to the April 3, 2009 meeting, when

juxtaposed with the latitude afforded to other employees from Woodhull Hospital and Alaniz's

subsequent termination of Plaintiff's use of compensatory time to attend Friday prayers, is

evidence of religious bias. However, Plaintiff does not present any evidence that other

individuals were permitted to arrive late for the meeting,[10] nor does he claim that Alaniz's

refusal to allow Plaintiff to arrive late was accompanied by any denigrating remarks. Plaintiff

must still establish that the treatment complained of was motivated by unlawful discrimination.

*See White v. N.Y. City Dep't of Educ.*, No. 05-CV-2064, 2008 WL 4507614 (E.D.N.Y. Sept. 30,

2008) ("Simply put, plaintiff must demonstrate that the conduct occurred because of, not

incidental to, the protected characteristic.").

Likewise, there is also no evidence to support Plaintiff's allegation that Alaniz patrolling

the office and looking to ensure that "people are where they are supposed to be," (Alaniz

Dep. 123:23–24), is indicative of any religious discriminatory animus. Alaniz went to look for

Plaintiff when he discovered that there was no documentation providing for Plaintiff to be on an

extended lunch hour on Fridays. Plaintiff has not presented any evidence that Alaniz did not

require the same documentation for non-Muslim co-workers or that he did not check up on non-

Muslim co-workers in the same manner. To the contrary, Plaintiff asserts that Alaniz created an

uncomfortable work environment for everyone. (Pl. Ex. 13.) Absent any evidence that Alaniz

did not look for other, non-Muslim co-workers in a similar manner or require documentation for

---

[10] Contrary to Plaintiff's argument, the fact that other employees from Woodhull
Hospital were granted one hour of travel time to permit them to arrive at the meeting site on time
does not mean that employees were treated differently than Plaintiff; all employees were
required to arrive at the meeting by 3 p.m.

their absence, or that Alaniz was otherwise motivated by religious bias, this level of excessive monitoring and scrutiny by Alaniz is insufficient to raise an inference of discriminatory bias.

Plaintiff also argues that the issuance of the August 17, 2009 counseling memorandum for excessive unscheduled absences creates an inference of discrimination because the basis for the issuance of the memorandum was entirely fabricated by Alaniz. Even if this speculative allegation were true, Plaintiff still has not shown that Alaniz fabricated such charges because of religious bias. *See Watson v. Geithner*, No. 11-CV-9527, 2013 WL 5441748 at *5 (S.D.N.Y. Sept. 27, 2013) ("Moreover, even if the counseling memoranda did qualify as adverse employment actions, Plaintiff never explains how an inference of discrimination should be drawn from the mere fact that [her supervisor] lied about the circumstances surrounding the memoranda."). In the same manner, Plaintiff's claim that the initiation of disciplinary charges against Plaintiff for fraud by his supervisor Florentino raises an inference of discrimination by Alaniz is wholly speculative and unsupported by any evidence in the record. Indeed, the record shows that Florentino was so supportive of Plaintiff that she agreed to accommodate his need for additional time to attend prayer services by not requiring Plaintiff to document his absence.

As to the statements by Alaniz that Plaintiff's *thawb* was "unprofessional according to American culture," and that Plaintiff was "stealing company time" by using compensatory time to attend Friday prayers, (St. Juste Aff. ¶ 51; St. Juste Dep. 174:18–174:25), and Alaniz's decision to close the Masjid-At-Taqwa as an enrollment site, the Court does not find them to be examples of any *overt* religious discriminatory animus. Likewise, Alaniz's termination of Plaintiff's ability to informally use compensatory time to attend Friday prayers is not intrinsically susceptible to a conclusion of bias. If Plaintiff had produced other evidence, such as evidence that Alaniz did not manage non-Muslim employees in a similarly rigid fashion, through

which to read these otherwise facially neutral actions by Alaniz, then Alaniz's actions towards Plaintiff could be more susceptible to reading as motivated by bias against Plaintiff's religion. As presented, however, the record only demonstrates that Alaniz treated Plaintiff in a micromanagerial and tough manner, and appears to have treated all employees similarly, according to Plaintiff. (*See* St. Juste Aff. ¶ 58 ("[n]otwithstanding what I perceived as religious animus, Alaniz was generally dictatorial, threatening and inconsiderate").) The record is insufficient to permit a jury to infer religiously biased motivation on Alaniz's part.

However, even assuming that Alaniz's actions are indicative of an underlying religious bias, Plaintiff has still not established the necessary inference that either the unpaid suspension for fraud in October 2009 or the termination of his informal use of compensatory time were motivated by Alaniz's bias. As Plaintiff concedes, the disciplinary charges were initiated by Florentino and not Alaniz, and there is no evidence to suggest that, even if Florentino had fabricated the charges against Plaintiff, as Plaintiff contends, that she did so at the behest of Alaniz.[11] (See Tr. 56:10–15.) Although Alaniz was required to review and approve Florentino's

---

[11] Plaintiff argues that evidence that Alaniz was subsequently discharged for falsifying his educational credentials supports the inference that "Alaniz was also capable of fabricating or forging documents to use against Plaintiff." (Pl. Mem. 19.) Plaintiff also argues that the fact that Florentino drafted the August 17, 2009 counseling memo for unscheduled absences although she did not agree with the memorandum supports the inference that she was being "puppeteered" or controlled by Alaniz. (Tr. 55:14–23.) Thus, Plaintiff appears to argue that Florentino's actions are attributable to Alaniz. Plaintiff concedes that the "direct connection between Alaniz and the fraud charges is attenuated." (Tr. 56:11–12.) Assuming that Alaniz's past acts of falsifying documents regarding his educational credential are admissible to support Plaintiff's argument here, *see* Fed. R. Evid. 404(b)(1) ("[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character"), this evidence still does not explain how Alaniz exerted enough control over Florentino to persuade her to falsify the documents, as Plaintiff alleges. Furthermore, the investigation by the Compliance Department resulted in the charges and an independent individual, Barneys, concluded that, of the three enrollment documents that Plaintiff was charged with fabricating, one was likely authentic, the authenticity of one could not be determined, and one was fabricated. The opportunity for Plaintiff to raise the defense that

memorandum before she sent it to the Compliance Department, there is no evidence that he was involved in Florentino's initial actions.   Moreover, even if he was, that initial decision was investigated by a separate department at Metro Plus and Plaintiff had a hearing by an independent official where that individual sustained one of the charges.  Plaintiff does not allege or present any evidence that Alaniz had any influence or control over the Compliance Department or Barneys, the individual who presided over his hearing.

Plaintiff has not alleged that Barneys's independence is disputed.  Thus Plaintiff cannot establish any inference of discrimination. In any event, even if the Court assumes that Plaintiff could raise an inference of discrimination with regard to his suspension or the termination of his compensatory time for Friday prayers, and thereby establish a *prima facie* case of disparate treatment, Plaintiff's claim fails nevertheless because he cannot show that Defendants' nondiscriminatory reason for their actions were mere pretext.

### 2.  Non-Discriminatory Explanation

Once a plaintiff establishes a *prima facie* case of discrimination, "the burden shifts to the defendant to offer a legitimate nondiscriminatory reason for the [employment action]."  *Ruiz*, 609 F.3d at 492; *see also Broich v. Inc. Vill. of Southampton*, 462 F. App'x 39, 42 (2d Cir. 2012). Defendants have articulated a legitimate, non-discriminatory reason for bringing fraud charges against Plaintiff which resulted in his sixty-day suspension without pay — the fact that Plaintiff was investigated and found to have fabricated enrollment forms.  Defendants have shown that Florentino had reasons for her suspicions which were investigated by the Compliance Department, and that Barneys heard evidence and ultimately sustained one of the charges against Plaintiff.  (Def. Mem. 13; Florentino Mem. at 68–70.)  *See Delia v. Donahoe*, 862 F. Supp. 2d

---

someone other than himself had fabricated the enrollment documents was at his disciplinary hearing, where he was present with a union representative, not before this Court.

196, 220 (E.D.N.Y. 2012) (finding that defendant "has articulated a legitimate, nondiscriminatory reason for issuing that Notice of Removal, to wit: plaintiff's violation of [defendant's] no-smoking policy").  As for the termination of Plaintiff's compensatory time, Defendants note that Plaintiff's ability to request compensatory time was never formally terminated, as he was provided with a copy of HHC policy on religious leave and was aware that he could request compensatory time, and that, instead, what was terminated was the informal arrangement that Plaintiff had with his supervisor to take compensatory time without submitting formal documentation.  (Tr. 5:21–6:6.)  Defendants further note that Plaintiff did not have any accrued annual leave at that time, that he had not requested formal compensatory time, and that he had not earned compensatory time.  (Tr. 5:21–6:6.)  It is also undisputed that in order to request leave for religious observance, an employee had to submit an SR-70 at least two weeks in advance, (Def. 56.1 ¶ 37; Pl. 56.1 ¶ 36), and that, based on the record before the Court, Plaintiff had not documented his accrual of formal compensatory time, (Tr. 42:13–23).  Defendants have met their burden.

### 3.  Pretext

Once a defendant has proffered a nondiscriminatory reason for its adverse action, the burden shifts back to the plaintiff to show that this reason is pretextual.  *Holcomb*, 521 F.3d at 141 (2d Cir. 2008).  To avoid summary judgment at this stage, plaintiff must offer evidence from which a reasonable jury could conclude by a preponderance of the evidence that religious discrimination played a role in the adverse actions taken against plaintiff.  *See Holcomb*, 521 F.3d at 141.  A "plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors."  *Holcomb*, 521 F.3d at 138

(quoting *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995)); *see also Nassar*, 570 U.S. at ---, 133 S. Ct. at 2526; *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 127 (2d Cir. 2013). At this stage of the burden-shifting analysis, "[c]onclusory and speculative allegations will not suffice to demonstrate discriminatory intent." *Henny v. New York State*, 842 F. Supp. 2d 530, 553 (S.D.N.Y. 2012).

Plaintiff has not established that Metro Plus's legitimate and non-discriminatory fraud investigation which resulted in his post-hearing suspension was merely pretext for discrimination. Plaintiff has failed to demonstrate that his suspension was motivated in part by religious discrimination. Plaintiff claims that Alaniz and/or Florentino fabricated the documents that gave rise to his fraud charges, but has no evidence on which to base this speculation. Essentially, Plaintiff asks the Court to make several assumptions without any evidence to support them. Plaintiff wants the Court to assume that his supervisor Florentino, who had always been extremely accommodating of Plaintiff, decided to fabricate evidence against Plaintiff because Alaniz wanted her to do so, and that Alaniz somehow influenced not just Florentino, but also prevented Plaintiff from contesting his innocence at his disciplinary hearing. Plaintiff agreed to resolve the charges with Metro Plus in exchange for his reinstatement. Other than speculation that Metro Plus was motivated in part by religious animus in bringing fraud charges against him, Plaintiff has presented no evidence, and therefore cannot show pretext. *See Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 99 (2d Cir. 2001) (affirming summary judgment for defendant where "[p]laintiffs failed to produce any evidence, other than conclusory statements unsupported by the record, to rebut the legitimate, nondiscriminatory reasons offered by [defendant], let alone evidence that could reasonably support a verdict in their favor"); *Lizardo v. Denny's, Inc.*, 270 F.3d 94, 104 (2d Cir. 2001) (finding that plaintiffs must do more to show

pretext than "cite to their mistreatment and ask the court to conclude that it must have been related to their race").

As for the termination of Plaintiff's compensatory time, Plaintiff argues that the reason proffered by Defendants is pretextual because of an inconsistency between Harris's explanation of the policy and Alaniz's explanation of the decision, and the fact that Alaniz claimed in his deposition to be unfamiliar with Metro Plus's policy regarding religious needs. (Pl. Mem. 14–15 (citing Alaniz Dep. 52).) However, even under Harris's more generous explanation of Metro Plus's policy regarding religious leave, managers maintain discretion to determine whether to permit employees to take leave, and Plaintiff has not pointed to any evidence indicating that Alaniz abused that discretion. Furthermore, although the evidence, viewed in the light most favorable to Plaintiff, is sufficient to establish a genuine issue of fact regarding whether Alaniz required Plaintiff to take only unpaid leave or annual leave, Plaintiff has not submitted any evidence indicating that he requested and was denied the ability to formally request and take compensatory leave. Plaintiff has not alleged that he submitted an SR-70 form requesting compensatory time off to attend Friday prayers. While it is undisputed that Alaniz terminated Plaintiff's ability to informally use compensatory time, and accepting Plaintiff's presentation of the evidence that Alaniz required Plaintiff to document that time as unpaid leave, there is no evidence in the record establishing that Alaniz refused any requests by Plaintiff to take formal compensatory time to attend Friday prayer. Absent any such evidence that could indicate that Alaniz's explanations for the termination of Plaintiff's informal use of compensatory time was pretext for religious discrimination, Plaintiff has not met his burden to show that Alaniz's decision was motivated, at least in part, by religious discrimination.

Defendants' motion for summary judgment as to Plaintiff's disparate treatment religious discrimination claim is granted.

### ii. Failure to Accommodate Religious Discrimination Claim

To establish a claim for failure to accommodate, a plaintiff has the initial burden to prove a *prima facie* case of discrimination. *Bowles v. New York City Transit Auth.*, 285 F. App'x 812, 813 (2d Cir. 2008) (citing *Philbrook v. Ansonia Bd. of Educ.*, 757 F.2d 476, 481 (2d Cir. 1985)); *see also Baker v. Home Depot*, 445 F.3d 541, 546 (2d Cir. 2006). The burden then shifts to the defendant to establish that it offered the plaintiff a reasonable accommodation, or that such an accommodation would have been an undue hardship. *Baker*, 445 F.3d at 546 ("Once a *prima facie* case is established by the employee, the employer 'must offer [him] a reasonable accommodation, unless doing so would cause the employer to suffer an undue hardship.'" (quoting *Cosme*, 287 F.3d at 158)). To avoid liability, "the employer need not offer the accommodation the employee prefers. Instead, when any reasonable accommodation is provided, the statutory inquiry ends." *Cosme*, 287 F.3d at 158; *see also Baker*, 445 F.3d at 548 ("We do note that employees are not entitled to hold out for the most beneficial accommodation." (citation and internal quotations omitted)).

### 1. *Prima Facie* Case

To establish a *prima facie* case of religious discrimination based on failure to accommodate, a plaintiff must prove that: "(1) he or she has a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed the employer of this belief; [and] (3) he or she was disciplined for failure to comply with the conflicting employment requirement." *Bowles*, 285 F. App'x at 813 (citations and internal quotation marks omitted); *see Baker*, 445 F.3d at 546 (2d Cir. 2006); *Weber*, --- F. App'x at ---, 2013 WL 5416868, at *20. To satisfy the first element, "whether a plaintiff has a 'bona fide religious belief,' the Court's

analysis is limited to whether the beliefs professed by the plaintiff are sincerely held and whether they are, in his own scheme of things, religious." *Hickey v. State Univ. of N.Y. at Stony Brook Hosp.*, No. 10-CV-1282, 2012 WL 3064170, at *6 (E.D.N.Y. July 27, 2012) (alteration, citation and internal quotation marks omitted). "To satisfy the second element, a plaintiff must properly notify the employer of the plaintiff's conflicting religious belief." *Hickey*, 2012 WL 3064170, at *7; *Massie v. Ikon Office Solutions, Inc.*, 381 F. Supp. 2d 91, 100 (N.D.N.Y. 2005). To satisfy the third element, a plaintiff must show that he suffered an adverse employment action for failing to comply with the employment requirement that conflicted with his religious belief. *See Edwards v. Elmhurst Hosp. Ctr.*, No. 11-CV-4693, 2013 WL 839535, at *4 (E.D.N.Y. Feb. 15, 2013) ("The third prong requires some adverse employment action — typically, discipline, demotion, transfer or termination — for refusing to comply with the conflicting employment requirement." (alterations and citation omitted)), *report and recommendation adopted*, No. 11-CV-4693, 2013 WL 828667 (E.D.N.Y. Mar. 6, 2013).

Here, there is no dispute that Plaintiff had a bona fide religious belief and that his employer Metro Plus knew about his religious belief. (Def. Mem. 8.) Defendants argue that Plaintiff cannot satisfy the third prong because Plaintiff was never prevented from, or disciplined for, taking longer than one hour for lunch on Fridays.[12] Plaintiff contends that he was disciplined when he was forced to take unpaid leave to accommodate his Friday prayers. (Pl. Mem. 23–24.) Plaintiff argues that requiring him to take unpaid leave in order to attend Friday prayers restricted and denied his prior accommodation, which was approved by Florentino, allowing him to take compensatory time to attend Friday prayer. Plaintiff contends that

---

[12] To the extent that Plaintiff seeks to challenge Alaniz's requirement that he appear on time for the April 3, 2009 meeting which was scheduled on a Friday afternoon when Plaintiff may have been attending Friday prayer or traveling from the mosque, such a challenge fails since Plaintiff has not shown that he was disciplined for arriving five minutes late to the meeting.

terminating his prior accommodation was a form of discipline for failing to comply with the employment requirement. (Pl. Opp. Mem. 23–24.)

Although the Second Circuit has not directly addressed what the "discipline" prong of a failure to accommodate religious discrimination claim requires, it has suggested that this can be equated with an adverse employment action. *See Marmulszteyn*, 523 F. App'x at 14 ("we agree with the District Court that [the plaintiff] failed to establish a *prima facie* case for his failure-to-accommodate claim because no evidence suggests that he suffered an adverse employment action"); *Leifer v. N.Y.S. Div. of Parole*, 391 F. App'x 32, 33 (2d Cir. 2010) (holding that plaintiff's failure to accommodate religious discrimination claim failed "because there is insufficient evidence showing that Leifer suffered an adverse employment action" (citing *Baker*, 445 F.3d at 546 (2d Cir. 2006)); *Bowles*, 285 F. App'x at 813–14 (affirming district court finding that plaintiff could not "establish the third prong of [plaintiff's] *prima facie* case" of failure to accommodate religious discrimination case where he "failed to offer any evidence tending to establish that he had suffered any adverse employment action as a result of the [Defendant's] alleged failure to accommodate Bowles's religious needs in a prompt manner"); *see also Guy v. MTA N.Y.C. Transit*, No. 10-CV-1998, 2012 WL 4472112, at *6 (E.D.N.Y. Aug. 6, 2012) (noting that although the Second Circuit has "has never defined 'discipline' within the context of the three-pronged religious discrimination test, . . . the third requirement has been equated with the requirement of an adverse employment action" (quoting *Siddiqi*, 572 F. Supp. 2d at 370 and *Price v. Cushman & Wakefield, Inc.*, 808 F. Supp. 2d 670, 695 (S.D.N.Y. 2011))), *report and recommendation adopted*, No. 10-CV-01998, 2012 WL 4472098 (E.D.N.Y. Sept. 26, 2012).

The case law is clear that requiring an employee to use *paid* leave to attend religious services does not constitute an adverse employment action. *See Guy*, 2012 WL 4472112, at *6

("[D]efendant's policy of requiring plaintiff to use paid vacation to observe the Sabbath does not amount to an adverse action sufficient to establish a *prima facie* case of religious discrimination."); *O'Neill v. City of Bridgeport Police Dep't*, 719 F. Supp. 2d 219, 226 (D. Conn. 2010) (finding that being "forced to use his vacation days to take Saturdays off," was not an adverse employment action for purposes of a failure to accommodate claim, as Plaintiff "was not deprived of a material benefit; he simply chose to use the benefit in a particular way"); *see also Jeffrey v. Montefiore Med. Ctr.*, No. 11-CV-06400, 2013 WL 5434635, at *19 (S.D.N.Y. Sept. 27, 2013) ("the fact that Montefiore scheduled Plaintiff to work on two Saturdays [when Plaintiff could not work for religious reasons] presented at most 'a mere inconvenience' given that Plaintiff undisputedly did not ultimately work those days").

However, it is less clear that being required to take *unpaid* leave for religious observances comprises an adverse action for purposes of a failure to accommodate claim. *See Guy*, 2012 WL 4472112, at *6 (assuming without deciding that "being forced to take unpaid leave to observe the Sabbath, when that results in a reduced work schedule and a loss in pay, could constitute an adverse action sufficient to establish a *prima facie* case of religious discrimination"); *compare Reed v. Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am.*, 569 F.3d 576, 581 (6th Cir. 2009) (rejecting argument that withdrawal by union of former accommodation that permitted Plaintiff not to work on Sabbath days, and replacement with requirement that plaintiff take unpaid leave was not a form of discipline, because "more than loss of pay is required to demonstrate discipline or discharge"), *with Morrissette-Brown v. Mobile Infirmary Med. Ctr.*, No. 04-CV-0069, 2006 WL 1999133, at *4 (S.D. Ala. July 14, 2006) ("The court finds that the imposition, against plaintiff's will, of a 30-day unpaid leave was

a disciplinary action, rather than an accommodation as claimed by defendant."), *aff'd*, 506 F.3d 1317 (11th Cir. 2007)).

Plaintiff needed more than his allotted hour for lunch in order to attend prayer services on Fridays. (Def. 56.1 ¶ 54; Pl. 56.1 ¶ 54.) Florentino allowed Plaintiff to use compensatory time to account for the additional time beyond Plaintiff's lunch hour. (Def. 56.1 ¶ 58; Pl. 56.1 ¶ 58.) Florentino also did not require Plaintiff to report any additional time used during lunch on his time sheets. (Def. 56.1 ¶ 56; Pl. 56.1 ¶ 56.) When supervised by Alaniz, Plaintiff claims that he was required to use unpaid leave rather than compensatory time, (Pl. Mem. 13; St. Juste Aff. ¶ 66), even though the policy of Metro Plus allowed for the use of compensatory time for religious observances, (Pl. Ex. 4). Plaintiff acknowledged that Alaniz gave him a choice of using his vacation days or taking unpaid leave in order to attend Friday prayer, (St. Juste Dep. 146:13–16), but claims that Alaniz later told Plaintiff that he had to document the time as unpaid leave because "he told me that I was stealing company time," (St. Juste Dep. 174:18–24).

HHC's Operating Procedure on Ethnic and Religious Holidays provides that approved leave for observance of ethnic or religious holidays could be charged to annual leave or compensatory time credits, and leave could be taken and charged against future accumulation of either annual or compensatory time if an employee had insufficient vacation days or accumulated compensatory time. (Pl. Ex. 4, Operating Procedure No. 20-18.) After meeting with Harris from the human resources department, Alaniz concluded that the hospital "could not reasonably accommodate his request for more than a one-hour lunch" on Fridays. (Alaniz Dep. 114:12–17.) Whether or not Plaintiff was *required* by Alaniz to do so, it is undisputed that he took unpaid leave to attend Friday prayers for a period of two to three months. (Def. 56.1 ¶ 94; Pl. 56.1 ¶ 94; *see also* Pl. Dep. 174:3–24.) Defendants argue that "[P]laintiff was never prevented from

attending Friday prayer services," and he was not disciplined for attending Friday prayers, and therefore he can not sustain a failure to accommodate claim. (Def. Mem. 8.)

In light of the fact that this prong of the analysis in a failure to accommodate claim is viewed in the same manner as the "adverse employment action" requirement in the discrimination context, and since in the discrimination context courts find that being required to take unpaid leave can be an adverse employment action, the Court will assume Defendants' failure to pay for time off to be "discipline" for purposes of Plaintiff's *prima facie* case, and assume that he has established a *prima facie* case.

### 2. Reasonable Accommodation

Once Plaintiff establishes a *prima facie* case of failure to accommodate, "the employer must offer him a reasonable accommodation, unless doing so would cause the employer to suffer an undue hardship." *Baker*, 445 F.3d at 546 (alteration, citation and internal quotation marks omitted). Defendants argue that they provided Plaintiff with the reasonable accommodation of being able to use unpaid leave to attend Friday prayers. (Def. Mem. 10.) Defendants are correct; this is a reasonable accommodation. *Guy*, 2012 WL 4472112 at *8 ("Generally, it is a reasonable accommodation of an employee's observance of the Sabbath for an employer to require the employee to use his or her vacation days or to take unpaid leave."); *Mustafa v. Syracuse City Sch. Dist.*, No. 05-CV-813, 2010 WL 4447774 at *11 (N.D.N.Y. Nov. 1, 2010) (noting that "if [plaintiff] ran out of personal time, he would have been granted unpaid leave for religious observances," indicating that defendant's accommodation was not an unreasonable one); *McLaughlin v. New York City Bd. of Educ.*, No. 04-CV-1270, 2008 WL 216308, at *14 (S.D.N.Y. Jan. 22, 2008) (finding that defendants' granting plaintiff an early release from school on Fridays was a reasonable accommodation, even though plaintiff "was not paid while he was away from school for this purpose" (citing *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 71

(1986))); *Man-of-Jerusalem v. Hill*, 769 F. Supp. 97, 101 (E.D.N.Y. 1991) ("HRA's policy of allowing plaintiff to take unpaid leave to observe Jewish holidays, without more, does not constitute a violation of Title VII."); *see also Ansonia*, 479 U.S. at 71 (noting that "the school board policy in this case, requiring respondent to take unpaid leave for holy day observance that exceeded the amount allowed by the collective-bargaining agreement, would generally be a reasonable one").

Plaintiff argues that *Guy* and *McLaughlin* are inapposite because the plaintiffs in those cases were unhappy with the accommodations provided to them, while Plaintiff has suffered a unique harm of having a particular accommodation rescinded. (Pl. Mem 24.) Plaintiff's attempt to distinguish these cases fails. The ultimate issue here is the fact that Plaintiff was required to take unpaid leave to attend Friday prayer services, and such an accommodation is one that courts in this Circuit have found to be a reasonable accommodation. Plaintiff cannot maintain a failure to accommodate claim merely because he did not receive his preferred accommodation. *See Cosme*, 287 F.3d at 158 ("[T]o avoid Title VII liability, the employer need not offer the accommodation the employee prefers. Instead, when any reasonable accommodation is provided, the statutory inquiry ends."). Nor does the fact that Plaintiff's preferred accommodation was no longer available to him give rise to a valid failure to accommodate claim. *See Mustafa*, 2010 WL 4447774, at *10 ("Although the parties should remain flexible when formulating such an accommodation, the employer need not offer the employee's preferred accommodation; rather, when any reasonable accommodation is provided, the statutory inquiry ends."); *Tomasino v. St. John's Univ.*, No. 08-CV-2059, 2010 WL 3721047, at *9 (E.D.N.Y. Sept. 23, 2010), *aff'd*, 476 F. App'x 923 (2d Cir. 2012) ("The employer is not required to offer the employee's preferred accommodation.").

The Court is aware that the Supreme Court has cautioned that "unpaid leave is not a reasonable accommodation when paid leave is provided for all purposes *except* religious ones," *Ansonia*, 479 U.S. at 70. In addition, the Second Circuit has noted that an accommodation may not be a reasonable one if it causes "an inexplicable diminution in his employee status or benefits," or "imposes a significant work-related burden on the employee without justification." *Cosme*, 287 F.3d at 160. However, Plaintiff has not presented any evidence establishing that Defendants provided paid leave for all purposes except religious ones, or that he suffered a significant diminution in his employee status or benefits. Nor does Plaintiff suggest that Defendants permitted other similarly situated employees to take paid time off for other religious observances. Rather, Plaintiff relies on the fact that the requirement to use unpaid leave went against HHC's policy regarding religious holidays, which permits the approval of annual leave or compensatory time to accommodate religious leave requests. (Pl. Mem. 25; Pl. Ex. 4, "HHC Operating Procedure.") However, it was within the discretion of managers to permit or deny a request for a religious accommodation, and they could deny such requests if they believed it would negatively affect their operations. (Harris Dep. 150:17–21.)

Plaintiff argues that such discretion amounts to "allowing managers to simply make up their own rules," opening the door to abuse in contravention of the HHC's own written policy. (Pl. Mem. 25.) Plaintiff's argument has some support in *Ansonia*, where the Supreme Court noted that "[a] provision for paid leave 'that is part and parcel of the employment relationship may not be doled out in a discriminatory fashion, even if the employer would be free . . . not to provide the benefit at all.'" *Ansonia*, 479 U.S. at 70 (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 75 (1984)). Under *Ansonia*, to establish that Defendants' accommodation was not a reasonable one, Plaintiff must offer evidence from which it could be inferred that Alaniz's

discretion was "doled out in a discriminatory fashion."  See *Ansonia*, 479 U.S. at 70.  Plaintiff

has not done so here.  Because Plaintiff has not presented any evidence that Alaniz acted in a

discriminatory manner in allowing the use of paid leave, Plaintiff cannot sustain his burden.  *See*

*id.* ("Whether the policy here violates this teaching turns on factual inquiry into past and present

administration of the personal business leave provisions of the collective-bargaining

agreement.").  In the absence of evidence that Plaintiff was singled out such that the requirement

that he use unpaid rather than paid leave is an aberration in Metro Plus's practices with respect to

other employees, the Court cannot find that the accommodation afforded to Plaintiff — that he

take unpaid leave in order to attend Friday prayers — is an unreasonable one.  Plaintiff's failure

to accommodate religious discrimination claim is therefore dismissed.

### e.    Retaliation Claims — Title VII and the NYSHRL

Plaintiff claims that Defendants retaliated against him for complaining about Alaniz's

conduct and for "defending himself against Alaniz's actions."  (Pl. Mem. 26–27.)  Title VII

prohibits discrimination against an employee "because he has opposed any practice made an

unlawful employment practice."  42 U.S.C.A. § 2000e-3(a); *see also Tepperwien v. Entergy*

*Nuclear Operations, Inc*., 663 F.3d 556, 567 (2d Cir. 2011) ("Title VII . . . prohibits an employer

from taking 'materially adverse' action against an employee because the employee opposed

conduct that Title VII forbids or the employee otherwise engaged in protected activity."

(citations omitted)); *Hicks v. Baines*, 593 F.3d 159, 161 (2d Cir. 2010).  Claims of retaliation for

engaging in protected conduct under Title VII and the NYSHRL are examined under the

*McDonnell Douglas* burden shifting test.[13]  *Summa v. Hofstra Univ*., 708 F.3d 115, 125 (2d Cir.

---

[13]  Although Plaintiff asserts a retaliation claim under § 1983, (Tr. 2:19–24), it is not clear
that such claims are cognizable in the Second Circuit.  *See Bernheim v. Litt*, 79 F.3d 318, 323 (2d
Cir. 1996) ("[W]e know of no court that has recognized a claim under the equal protection clause

2013) ("The burden-shifting framework laid out in *McDonnell Douglas* . . . governs retaliation

claims under . . . Title VII" (citing *McDonnell Douglas*, 411 U.S. at 802)).  Under the test,

"[f]irst, the plaintiff must establish a *prima facie* case of retaliation.  If the plaintiff succeeds,

then a presumption of retaliation arises and the employer must articulate a legitimate, non-

retaliatory reason for the action that the plaintiff alleges was retaliatory."  *Fincher v. Depository*

*Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (citations omitted); *see also*

*Tepperwien*, 663 F.3d at 568 n.6 (discussing the burden shifting analysis in retaliation context);

*Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005) (same).  If the employer

succeeds at the second stage, then the presumption of retaliation dissipates, and the plaintiff must

show that, *but for* the protected activity, she would not have been terminated.[14]  *See Nassar*, 570

---

for retaliation following complaints of . . . discrimination.  Given the availability of Title VII, which [plaintiff] has chosen not to invoke, we see no reason to break new constitutional ground in this case."); *Pedrosa v. City of New York*, No 13-CV-01890, 2014 WL 99997, at *8 (S.D.N.Y. Jan. 9, 2014) ("Retaliation claims under § 1983 are commonly brought as First Amendment free speech claims, but are not actionable as Fourteenth Amendment equal protection claims.").  The Court acknowledges that there is some support for recognizing the claim in this context.  *See Hicks v. Baines*, 593 F.3d 159, 171 (2d Cir. 2010) ("The premise of this lawsuit is that plaintiffs were treated differently — that is, they suffered retaliation — on the basis of their participation in discrimination investigations and proceedings. That participation obviously constitutes an 'impermissible' reason to treat an employee differently."); *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 261 (E.D.N.Y. 2012) (discussing identical analysis for retaliation claims brought "under Title VII . . . the NYSHRL, and § 1983"), *aff'd*, 713 F.3d 163 (2d Cir. 2013).  In any event, as § 1983 claims are generally construed in an identical manner to Title VII claims, the Court need not resolve this discrepancy as Plaintiff's Title VII retaliation claim does not survive summary judgment.

[14]  It is unclear whether the Supreme Court decision in *Nassar*, which changed the standard for establishing causation in a retaliation claim from showing that retaliation was a "motivating factor," to showing that it is a "but-for" cause of the adverse employment action, applies to retaliation claims brought pursuant to the NYSHRL.  New York State courts have yet to directly address the impact of the Supreme Court's recent holding in *Nassar* on the NYSHRL, nor has the Second Circuit had the opportunity to address this issue.  *See Giudice v. Red Robin Int'l, Inc.*, --- F. App'x ---, ---, 2014 WL 552668, at *2 (2d Cir. Feb. 13, 2014) (declining to address "any differences between the standard stated in *Summa* [holding that retaliation claims under Title VII and NYSHRL are analyzed in an identical manner] and the Supreme Court's

U.S. at ---, 133 S. Ct. at 2534 (emphasis added) (holding that a plaintiff "must establish that his

or her protected activity was a but-for cause of the alleged adverse action by the employer"); *see*

*also Ellis v. Century 21 Dep't Stores*, --- F. Supp. 2d at ---, ---, 2013 WL 5460651, at *27

(E.D.N.Y. Sept. 28, 2013) (same); *Russo v. New York Presbyterian Hosp.*, --- F. Supp. 2d ---, ---,

---

articulation of the 'but-for' standard in *Nassar*); *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 847 n.7 (2d Cir. 2013) ("Because the plaintiff's claims survive under the *Nassar* 'but-for' standard, we do not decide whether the NYSHRL claim is affected by *Nassar,* which by its terms dealt only with retaliation in violation of Title VII."). In deciding a retaliation claim under the NYSHRL after *Nassar*, the First Department did not specifically decide the issue but noted that the plaintiff "will be unable to prove that the challenged failure to reassign occurred, *in whole or in part*, because of retaliation." *Simmons-Grant v. Quinn Emanuel Urquhart & Sullivan, LLP*, 981 N.Y.S.2d 89, 93 (App. Div. 2014) (emphasis added)).

      Traditionally, "[t]he standards for evaluating . . . retaliation claims are identical under Title VII and the NYSHRL." *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (per curiam) (citing *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 n.1 (2d Cir. 2000)); *Vandewater v. Canandaigua Nat. Bank*, 893 N.Y.S.2d 916 (2010) ("It is well settled that the federal standards under [T]itle VII of the Civil Rights Act of 1964 are applied to determine whether recovery is warranted under the Human Rights Law." (citing *Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295, 330 (2004))). The relevant provisions of Title VII and NYSHRL are textually similar, and both prohibit an employer from discriminating or retaliating against an individual "because" he or she engaged in protected activity. In *Nassar*, the Supreme Court held that under "the default rules" of statutory construction, "causation" should be interpreted as "but-for causation" "absent an indication to the contrary in the statute itself," and interpreted Title VII's use of "because" as requiring "proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. ---, ---, 133 S. Ct. 2517, 2528 (2013). Since the NYSHRL statutory language is the same, and the New York Court of Appeals has consistently stated that federal Title VII standards are applied in interpreting the NYSHRL, this Court will continue to interpret the standard for retaliation under the NYSHRL in a manner consistent with Title VII jurisprudence, as clarified by the Supreme Court in *Nassar*. *See, e.g.*, *Russo v. New York Presbyterian Hosp.*, --- F. Supp. 2d ---, ---, 2013 WL 5346427, at * 18 (E.D.N.Y. Sept. 23, 2013) (discussing post-*Nassar* retaliation standard under NYSHRL); *Leacock v. Nassau Health Care Corp.*, No. 08-CV-2401, 2013 WL 4899723, at *9 n.4 (E.D.N.Y. Sept. 11, 2013) (continuing to construe the NYSHRL retaliation standard as requiring the same elements as Title VII after *Nassar* (citing *Dall v. St. Catherine of Siena Med. Ctr.*, --- F. Supp. 2d ---, ---, 2013 WL 4432354, at * 19 n.12 (E.D.N.Y. Aug. 14, 2013))); *Dall*, --- F. Supp. 2d at ---, 2013 WL 4432354, at * 19 n.12 (interpreting the plaintiff's NYSHRL retaliation claim consistently with his Title VII retaliation claim after *Nassar*); *Brown v. City of New York*, No. 11-CV-2915, 2013 WL 3789091, at *19 (S.D.N.Y. July 19, 2013) (reviewing the but-for causation requirement for Title VII retaliation articulated in *Nassar* and stating that the plaintiff's "retaliation claim under the NYSHRL is 'analytically identical to [her] claims brought under Title VII'" (citation omitted)).

2013 WL 5346427, at *18 (E.D.N.Y. Sept. 23, 2013); *Moore*, 2013 WL 3968748, at *14 (same).

### i. *Prima Facie* **Case**

In order to establish a *prima facie* case of retaliation, a plaintiff must establish "(1) she engaged in protected activity; (2) the employer was aware of this activity; (3) the employee suffered a materially adverse employment action; and (4) there was a causal connection between the alleged adverse action and the protected activity." *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (per curiam) (quoting *Lore*, 670 F.3d at 157); *see also Summa*, 708 F.3d at 125; *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 608 (2d Cir. 2006). The burden for a plaintiff at the summary judgment stage is "'minimal' and '*de minimis*,'" and "the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Kwan*, 737 F.3d at 844 (quoting *Jute*, 420 F.3d at 173).

Defendants argue that Plaintiff cannot establish a *prima facie* case of retaliation because Plaintiff did not engage in any protected activity prior to experiencing any of his allegedly adverse actions, and that Plaintiff cannot show that he experienced an adverse action. (Def. Reply 14–15.) Defendants further argue that even if Plaintiff could establish a *prima facie* case, Defendants had nonretaliatory reasons for their actions. (Def. Mem. 11–13.)

### 1. **Protected Activity and Defendants' Knowledge**

Plaintiff alleges that he participated in various protected activities including: (1) sending an email on May 19, 2009 to Harris regarding "a meeting [Plaintiff] had with Alaniz, asking to meet with Harris "in reference to my religion," (Pl. Ex. 8), (2) sending an email to Florentino on June 17, 2009, listing his complaints against Alaniz which he then forwarded to Barneys and Harris in the human resources department, (3) verbally complaining to Harris, Alaniz, and

Chasse about Plaintiff's interactions with Alaniz, and (4) resisting Alaniz's ill treatment based on animus to Plaintiff's religion, (Pl. Mem. 26).

Title VII's antiretaliation provision is "construed to cover a broad range of employer conduct." *Thompson v. N. Am. Stainless, LP*, 562 U.S. ---, ---, 131 S. Ct. 863, 868 (2011). It is not necessary that the conduct is actually prohibited by Title VII, but only that the plaintiff had a "good faith belief" that such conduct was prohibited. *La Grande v. DeCrescente Distrib. Co.*, 370 F. App'x. 206, 212 (2d Cir. 2010) ("It is well-established that a 'plaintiff may prevail on a claim for retaliation even when the underlying conduct complained of was not in fact unlawful so long as he can establish that he possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated [the] law.'" (quoting *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002))); *Dall v. St. Catherine of Siena Med. Ctr.*, --- F. Supp. 2d ---, ---, 2013 WL 4432354, at *20 (E.D.N.Y. Aug. 14, 2013) (plaintiff need only have a "'good faith belief' that employer conduct was prohibited" (quoting *La Grande*, 370 F. App'x at 212))); *Kanhoye v. Altana Inc.*, 686 F. Supp. 2d 199, 206 (E.D.N.Y. 2009) ("'An employee is privileged to report and protest workplace discrimination, whether that discrimination be actual or reasonably perceived.'" (quoting *Matima v. Celli*, 228 F.3d 68, 78 (2d Cir. 2000))).

The complaint can be informal — an employee does not need to lodge a formal complaint of discrimination. *See Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000) ("[T]he law is clear that opposition to a Title VII violation need not rise to the level of a formal complaint in order to receive statutory protection, this notion of 'opposition' includes activities such as 'making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges.'" (quoting *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d

Cir. 1990))); *Ellis*, --- F. Supp. 2d at ---, 2013 WL 5460651, at *29 ("In order to oppose sexual harassment, [p]laintiff need not have filed a formal complaint as long as she complained of activity that she had a good faith, reasonable belief violated the law."); *Bennett v. Hofstra Univ.*, 842 F. Supp. 2d 489, 500 (E.D.N.Y. 2012) (Title VII does not require a formal complaint.); *Martin v. State Univ. of N.Y.*, 704 F. Supp. 2d 202, 227 (E.D.N.Y. 2010) ("It is clearly established that 'informal complaints to supervisors constitute protected activity under Title VII.'" (citations omitted)).

However, while such complaints may be informal, they cannot be so vague or "generalized" that the employer could not "reasonably have understood[] that the plaintiff's complaint was directed at conduct prohibited by Title VII." *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 108 (2d Cir. 2011) (alteration and citation omitted); *see also Ellis*, --- F. Supp. 2d at ---, 2013 WL 5460651, at *28 (E.D.N.Y. Sept. 28, 2013) ("When making the complaint, Plaintiff must do so in 'sufficiently specific terms so that the employer is put on notice that the plaintiff believes he or she is being discriminated against on the basis of [the protected status].'" (quoting *Brummell v. Webster Cent. Sch. Dist.*, No. 06-CV-6437, 2009 WL 232789, at *6 (W.D.N.Y. Jan. 29, 2009))); *Int'l Healthcare Exch., Inc. v. Global Healthcare Exch., LLC*, 470 F. Supp. 2d 345, 357 (S.D.N.Y. 2007) ("ambiguous complaints that do not make the employer aware of alleged discriminatory misconduct do not constitute protected activity").

Plaintiff claims that his protected activity consists of email and verbal communications with his supervisors and the human resources department.[15]  In the May 19, 2009 email to

<hr />

[15]  Plaintiff argues that he also made "verbal complaints" to his supervisors as part of his protected activity, (Pl. Mem. 26 (citing St. Juste Aff. ¶ 92)), but neither party addressed these allegations in the briefings or at oral argument, and there is no further detail about such verbal

Harris, Plaintiff stated "I really need to meet with you in regards to a meeting I had with [R]icardo [Alaniz]. . . . Its [sic] in reference to my religion." (Pl. Ex. 8.) This email is not protected activity, as Plaintiff's counsel conceded, in view of the absence of any reference to concerns about discrimination. (Tr. 66:7–14.)

However, Plaintiff's communication approximately one month later to his supervisor is a protected activity. In an email sent to Florentino on June 17, 2009, Plaintiff stated:

> [M]r. Alaniz told me . . . that the way I dressed was not professional and that me attending religious services was in violation of the operations regulations. [I] questioned him about his tactics because it appeared to me that he was trying to make me choose between my job and my religion. [I] even mentioned to him about federal laws to prevent such incidents from [o]ccurring, his response was that me attending religious services was at his discretion. . . . [h]e even accused me of stealing company time when [I] go to services.

(Pl. Ex. 13 at 2.) Plaintiff forwarded this email to Barneys and Harris on June 19, 2009. (*Id.* at 1.) Such language falls within the scope of the type of "informal" complaints to management that are protected by Title VII. *See Hubbard v. Total Commc'ns, Inc.*, 347 F. App'x 679, 681 (2d Cir. 2009) (affirming that an email complaint alleging differential treatment between plaintiff and the "guys" in her department was sufficiently specific to be protected activity); *cf. Rojas*, 660 F.3d at 103 (plaintiff's complaint that co-worker was "making her life miserable" was too vague to be protected activity). Contrary to Defendants' argument, Plaintiff's complaints about Alaniz's "actions" did not have to specify "that he opposed a practice made unlawful by a particular statute." (Def. Reply 14.) Plaintiff is only "required to have had a good faith, reasonable belief that [he] was opposing an employment practice made unlawful by Title VII," *Kelly*, 716 F.3d at 14; *see also Rosioreanu v. City of New York*, 526 F. App'x 118, 120 (2d Cir.

_____

complaints in the record. Accordingly, the Court assumes that these verbal complaints occurred concurrently with the email correspondence, and treats both as one allegation.

2013) (explaining that "'implicit in the requirement that the employer [was] aware of the protected activity is the requirement that the [employer] understood, or could have reasonably understood,' that the plaintiff's complaints, constituting the protected activity, were based on conduct prohibited by Title VII" (alterations in original) (quoting *Galdieri-Ambrosini v. Nat'l Realty & Dev't Corp.*, 136 F.3d 276 (2d Cir. 1998))).  Here, Plaintiff's complaint that his supervisor was trying to make him choose between his job and his religion falls within the scope of conduct that is prohibited by Title VII.

Plaintiff also argues that he engaged in protected activity each time he "defended himself against Alaniz's actions," such as "defending his right to attend Friday prayers." (Pl. Mem. 26–27.)  Although resistance to discrimination has been found to be protected activity under Title VII, courts in the Second Circuit are divided on this issue.  *Compare Johnson v. Medisys Health Network*, No. 10-CV-1596, 2011 WL 5222917, at *16 (E.D.N.Y. June 1, 2011) (finding that plaintiff's resistance to consistent harassment by her supervisor over the course of eight years comprised "protected activity"), *report and recommendation adopted as modified on other grounds*, No. CV-10-1596, 2011 WL 4101323 (E.D.N.Y. Sept. 8, 2011), and *Little v. Nat'l Broad. Co., Inc.*, 210 F. Supp. 2d 330, 386 (S.D.N.Y. 2002) (concluding that rejecting sexual advances from an employer constitutes protected activity"), *with Garrigan v. Ruby Tuesday, Inc.*, No. 13-CV-1196, 2013 WL 3946223, at *3 (S.D.N.Y. July 30, 2013) (finding that rejection of sexual advances does not comprise protected activity), and *Reid v. Ingerman Smith LLP*, 876 F. Supp. 2d 176, 189 (E.D.N.Y. 2012) (finding that rejection of sexual advances were not protected activity for retaliation claim) (quoting *Del Castillo v. Pathmark Stores, Inc.*, 941 F. Supp. 437, 439 (S.D.N.Y. 1996))).

According to Plaintiff's view of the facts, he told Alaniz that he was required by his faith to attend Friday prayers, and when Alaniz told him that his ability to take an extended lunch in order to attend was subject to Alaniz's discretion, Plaintiff continued to attend. Plaintiff explains that this continued attendance was his form of resisting Alaniz's wrongful efforts to make Plaintiff choose between his job and his religion, and in his email of June 17, 2009 to Florentino, which was forwarded to Barneys and Harris on June 19, 2009, Plaintiff complained that Alaniz's comments "appeared to me that he was trying to make me choose between my job and my religion." (Pl. Ex. 13 at 2.) The Court assumes for purposes of this motion that Plaintiff's resistance can be construed as a form of opposing Alaniz's actions as discriminatory. In sum, Plaintiff's email communications of June 17, 2009 to Florentino, which was forwarded on June 19, 2009 to Barneys and Harris, were protected activity, and the Court assumes without deciding that Plaintiff's continuing to attend Friday prayers was also protected activity.

In addition, because the emails were sent to Plaintiff's supervisor Florentino and forwarded to individuals in the human resources department, Defendants had knowledge of those emails. Plaintiff does not have to prove that other specific actors knew of the protected activity as long as Plaintiff can demonstrate general corporate knowledge. *See Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000) ("Neither this nor any other circuit has ever held that, to satisfy the knowledge requirement, anything more is necessary than general corporate knowledge that the plaintiff has engaged in a protected activity."); *see also Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 92 (2d Cir. 2011) ("Even if the agents who carried out the adverse action did not know about the plaintiff's protected activity, the 'knowledge' requirement is met if the legal entity was on notice."). The Court assumes, based on Plaintiff's version of the facts, that Alaniz, as Plaintiff's supervisor, had knowledge that when

Plaintiff continued attending Friday prayers even after Alaniz informed him that such attendance was subject to Alaniz's discretion, that such continued attendance was an expression of Plaintiff's belief that Alaniz's comment was discriminatory. The combination of Plaintiff's email to his supervisors complaining that Alaniz was attempting to make him choose between his religion and work, and Plaintiff's open and continued attendance at Friday prayer services, could reasonably have put Metro Plus on notice that Plaintiff's conduct was a form of opposing what he believed was Alaniz's discriminatory actions. Accordingly, Plaintiff has satisfied this prong of his *prima facie* showing.

### 2. Adverse Actions

Plaintiff alleges the same adverse actions under his retaliation claim as he did with respect to his discrimination claim: (1) the termination of the mosque as an enrollment site, (2) the generation of a counseling memorandum and counseling session on or around August 17, 2009, regarding excessive unscheduled absences, (3) Plaintiff's suspension in connection with fraud charges, and (4) Plaintiff's transfer to the Bronx after he was reinstated. In addition, Plaintiff claims that Defendants retaliated against him by eliminating his ability to use compensatory time to attend Friday prayers. (Pl. Opp. 26–27.)

To establish an adverse action for purposes of a retaliation claim, "[a] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Fincher*, 604 F.3d at 721 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). The scope of actions that may be materially adverse for purposes of a Title VII retaliation claim is broader than those actions prohibited by Title VII's anti-discrimination provisions; the latter apply to the terms and conditions of employment, while the former "anti-retaliation protection is broader and 'extends beyond workplace-related or

employment-related retaliatory acts and harm.'" *Baines*, 593 F.3d at 165; *see also Fincher*, 604 F.3d at 721 ("The anti-retaliation law 'protects an individual not from all retaliation, but from retaliation that produces an injury or harm.'" (quoting *Burlington Northern*, 548 U.S. at 67)). In addition, "the alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable." *Baines*, 593 F.3d at 165. In evaluating whether an action is material, "'[c]ontext matters,' as some actions may take on more or less significance depending on the context." *Tepperwien*, 663 F.3d at 568.

### A.   Use of unpaid leave

Construing the facts in the light most favorable to Plaintiff, requiring him to use unpaid leave, rather than compensatory time, to attend Friday prayers does have a material impact on Plaintiff since he is being asked to give up actual pay which is a material benefit. A reasonable employee could well be dissuaded from complaining about discrimination if he were required to give up enjoyment of the use of compensatory time and forego pay in order to attend weekly prayer. *See Ebanks*, 2009 WL 891796, at *5 (finding that failure to authorize overtime and/or compensatory time comprised a materially adverse action under more stringent discrimination standard). Although it appears that Plaintiff was not denied the use of formal, properly documented compensatory time, but rather, was merely denied the arrangement that he had with Florentino to informally use compensatory time, (Tr. 5:16–6:9), Plaintiff contends that Alaniz required him to take unpaid leave, (St. Juste Aff. ¶ 62). Viewing the record in the light most favorable to Plaintiff, the Court will treat this as an adverse action for his retaliation claim.

### B.   Disciplinary charges and suspension

As discussed above, the initiation of fraud charges against Plaintiff, which resulted in a suspension without pay, is a "materially adverse" action taken against Plaintiff. *See Burlington*

*Northern*, 548 U.S. at 73 ("indefinite suspension without pay could well act as a deterrent, even if the suspended employee eventually received backpay"); *Porter v. Donahoe*, No. 10-CV-3297, 2013 WL 4505409, at *7 (E.D.N.Y. Aug. 23, 2013) (one day suspension without pay materially adverse).

### C.   Termination of Mosque as enrollment site

The termination of the Masjid-At-Taqwa as an enrollment site, as discussed *supra* in part d.i.1.A.3, did not have a materially adverse impact on Plaintiff, as there is no evidence that the discontinuation harmed Plaintiff's personal productivity.  Although an adverse action, in the retaliation context, does not have to be related to the terms and conditions of employment, no reasonable employee would have found the discontinuance of the mosque as one enrollment site out of many to be materially adverse.  While Plaintiff had "good community standing" at the mosque and may have had a personal preference to be stationed there, it remained one among many sites to which Plaintiff was assigned by his supervisors.  In this sense, the discontinuance of the mosque as an enrollment site is tantamount to a reassignment of tasks and is not an adverse action.  *See Cayemittes v. City of New York Dep't of Hous. Pres. & Dev.*, --- F. Supp. 2d ---, ---, 2013 WL 5434619, at *17 (S.D.N.Y. Sept. 30, 2013) (finding that a reassignment that simply reshuffled plaintiff to a different team without changing his salary was "nothing more than an alteration of his job responsibilities" and therefore not a materially adverse action).

### D.   Counseling memorandum

The counseling memorandum issued to Plaintiff on August 17, 2009, with a copy to Chasse and the human resources department, can be considered a materially adverse action, in the retaliation context.  A formal reprimand can be an adverse action for purposes of a retaliation claim, "even when . . . the letter does not directly or immediately result in any loss of wages or benefits, and does not remain in the employment file permanently," because "it can reduce an

employee's likelihood of receiving future bonuses, raises, and promotions, and it may lead the employee to believe (correctly or not) that his job is in jeopardy." *Millea v. Metro-N. R. Co.*, 658 F.3d 154, 165 (2d Cir. 2011); *see also McAvey v. Orange-Ulster BOCES*, No. 07-CV-11181, 2012 WL 161839, at *3 (S.D.N.Y. Jan. 18, 2012) (letter of reprimand placed in plaintiff's file adverse action under *Burlington Northern*); *Mazyck v. Metro. Transp. Auth.*, 893 F. Supp. 2d 574, 591–92 (S.D.N.Y. 2012) (finding issuance of formal Letter of Instruction for tardiness was an adverse action for retaliation claim).

Although the Second Circuit has found that rescinded discipline cannot constitute material adversity, where an employee is never placed in an active disciplinary process, *see Tepperwien*, 663 F.3d at 570, here, Plaintiff's counseling memorandum was never formally rescinded. Rather, his counseling session never took place because he was suspended for other reasons prior to that scheduled date. It is unclear whether the charges against Plaintiff were ever formally "rescinded," although it appears that the counseling session was never re-scheduled once Plaintiff was reinstated to his position in late 2009 or early 2010. In any event, even without the subsequent counseling session, for purposes of Plaintiff's retaliation claim, the Court will consider the counseling memorandum issued to him on August 17, 2009, an adverse action.

### E. Transfer to the Bronx

Plaintiff's transfer to the Bronx upon his reinstatement in December 2009 is not an action that a reasonable employee would find to be adverse, particularly in light of the fact that the transfer was provided as a mutually-desirable way to remove Plaintiff from a worksite with Florentino and Alaniz. "A lateral job transfer that does not affect an employee's salary or title may be the basis for a Title VII retaliation claim only if the reassignment would have been viewed by a reasonable employee as being materially adverse." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 555 (2d Cir. 2010) (citing *Burlington Northern*, 548 U.S. at 68). Although Plaintiff

characterizes the commute as being a "hardship" for him, (Am. Compl. ¶ 42), increased commute time is insufficient for his transfer to be considered materially adverse. See *Witkowich v. Holder*, No. 05-CV-7756, 2010 WL 1328364, at *4 (S.D.N.Y. Mar. 31, 2010) (plaintiff's allegation that "punitive" transfer "to a significantly less desirable post geographically further away from his residence," was insufficient to establish adverse action for retaliation claim), *aff'd*, 424 F. App'x 20 (2d Cir. 2011); *Everson v. New York City Transit Auth.*, No. 02-CV-1121, 2007 WL 539159, at *31 (E.D.N.Y. Feb. 16, 2007) ("[P]laintiff has failed to prove that his transfer from Brooklyn to the Bronx was a materially adverse employment action . . . . [I]t is clear the plaintiff bases his argument on the transfer work site's mere distance from his home but offers no other damaging consequences of the transfer."); *cf. Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 210 (2d Cir. 2006) (finding that plaintiff's transfer to an office where he "would not be allowed to perform the broad discretionary and managerial functions of that position, no one would report to him, and he would be forced to do work normally performed by clerical and lower-level personnel" was an adverse employment action under *Burlington Northern*); *Flynn v. New York State Div. of Parole*, 620 F. Supp. 2d 463, 491 (S.D.N.Y. 2009) (transfer to a position where plaintiff "was no longer responsible for supervising the cases that were of particularly high interest and of a sensitive nature" could be an adverse action for retaliation claim). Plaintiff's transfer to the Bronx is not an adverse action for purposes of his retaliation claim.

In sum, the Court will consider (1) the disciplinary charges resulting in a 60-day suspension, (2) the August 17, 2009 counseling memorandum issued in connection with excessive absences, and (3) the requirement that Plaintiff use either annual leave or unpaid leave,

rather than compensatory time, to attend Friday prayers as materially adverse actions, satisfying this prong of Plaintiff's *prima facie* case of retaliation.

### 3. Causal Connection

Plaintiff argues that the adverse actions took place between April 2009 through January 2010, and occurred in close temporal proximity to Plaintiff's protected activity, thereby establishing a causal connection for purposes of his *prima facie* case. (Pl. Mem. 28.)

"[A] plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action." *Gorzynski*, 596 F.3d at 110–11 (quoting *Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001)); *Kim v. Columbia Univ.*, 460 F. App'x 23, 25 (2d Cir. 2012) ("[T]emporal proximity between protected activity and adverse action may be sufficient to satisfy the causality element of a *prima facie* retaliation claim . . . ."); *Feingold*, 366 F.3d at 156 ("[T]he requirement that [plaintiff] show a causal connection between his complaints and his termination is satisfied by the temporal proximity between the two."); *Trivedi*, 818 F. Supp. 2d at 736 ("Mere temporal proximity between a plaintiff's protected activity and an adverse employment action is sufficient to create an inference of retaliation for purposes of proving a *prima facie* case."). There is no bright line rule for how long after a plaintiff has engaged in the protected activity that the adverse action must have occurred to benefit from the inference but generally courts measure the time in months. *See, e.g.*, *Gorzynski*, 596 F.3d at 110 ("Though [the Second Circuit] has not drawn a bright line defining, for the purposes of a *prima facie* case, the outer limits beyond which a temporal relationship is too attenuated to establish causation, [it has] previously held that five months is not too long to find the causal relationship."); *Gordon-Bakos v. Cornell Coop. Ext.*, 252 F.3d 545, 554–55 & n.5 (2d Cir. 2001) (finding spans of four and five months sufficient to establish a

causal relationship). "[B]ut-for causation standard does not alter the plaintiff's ability to demonstrate causation at the *prima facie* stage on summary judgment or at trial indirectly through temporal proximity." *Kwan*, 737 F.3d at 845; *see also Dall*, --- F. Supp. 2d at ---, 2013 WL 4432354, at *22 ("[A] plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action." (quoting *Gorzynski*, 596 F.3d at 110–11)); *see also Kim*, 460 F. App'x at 25 ("[T]emporal proximity between protected activity and adverse action may be sufficient to satisfy the causality element of a *prima facie* retaliation claim . . . ."); *Feingold*, 366 F.3d at 156 ("[T]he requirement that [plaintiff] show a causal connection between his complaints and his termination is satisfied by the temporal proximity between the two.").

Of the adverse actions established by Plaintiff, the termination of his use of compensatory time to attend Friday prayers took place *prior* to any protected activity. The first protected activity that Plaintiff engaged in was his June 17, 2009 email to Florentino complaining about Alaniz's conduct. Because this email was sent subsequent to, and as a result of, the conversation with Alaniz in which Alaniz informed Plaintiff that he was required to use either annual leave or unpaid leave to attend Friday prayers, the email cannot be the cause of the allegedly retaliatory action of terminating his use of compensatory time to attend Friday prayer.

The remaining two adverse actions — the August 2009 counseling memorandum and session, and the October 2009 suspension — occurred two and four months, respectively, after Plaintiff's email communication of June 17, 2009. Plaintiff was formally charged with fraud on October 16, 2009, and the final decision suspending Plaintiff for 60 days without pay took place on or about October 29, 2009. (Def. 56.1 ¶ 107; Pl. 56.1 ¶ 107; Def. Ex. V, Letter dated Oct. 16, 2009; Def. Ex. Y.) The lapse of four months between Plaintiff's June 17, 2009 email to

Florentino and his pre-hearing suspension is sufficient to establish a causal connection at the *prima facie* stage. *See Gorzynski*, 596 F.3d at 110. Likewise, the issuance of a counseling memorandum to Plaintiff on August 17, 2009, two months after his email to Florentino, is sufficiently close in time to allow Plaintiff to establish a causal connection at the *prima facie* stage. Accordingly, Plaintiff has established a *prima facie* case that two actions by Defendants were taken in retaliation for Plaintiff's protected activity: (1) the disciplinary charges resulting in a 60-day suspension without pay, and (2) the August 17, 2009 counseling memorandum and session issued in connection with excessive absences.

### ii. Non-Discriminatory Reason

"Once the plaintiff has established a *prima facie* showing of retaliation the burden shifts to the employer to articulate some legitimate, non-retaliatory reason for the employment action." *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010). Defendants argue that the nondiscriminatory reason for the initiation of fraud charges against Plaintiff, which resulted in a pre-hearing suspension without pay, was an investigation by Florentino that yielded evidence that Plaintiff had fabricated enrollment forms. (Def. Mem. 13.) Defendants have shown that Florentino was acting pursuant to her duties in conducting quality assurance when she noticed unusual features of specific enrollment forms, and that her own investigation yielded corroborating evidence from customers. (Def. 56.1 ¶ 102; Pl. 56.1 ¶ 101 *See* Florentino Mem; Suspected Fraud and Abuse Form.) She then handed over the investigation to the Compliance Department, and an independent hearing was conducted. (Def. 56.1 ¶¶ 107, 110; Pl. 56.1 ¶109.) Defendants also proffer that Plaintiff was issued a counseling memorandum because he was absent five times within a one month span, and that, in the absence of documentation, Defendants' policy permits the scheduling of a counseling session. (Tr. 12:25–13:6.)

Defendants have satisfied their burden of production in articulating a nondiscriminatory reason for initiating fraud charges against Plaintiff and for issuing the counseling memorandum and scheduling a counseling session.

### iii. Pretext

Although Plaintiff has established a *prima facie* case of retaliation, Plaintiff cannot prove that but for his email complaints and his resistance to Alaniz's behavior, he would not have been suspended for sixty days without pay. Under the recent Supreme Court decision in *Nassar*, "Title VII retaliation claims must be proved according to traditional principles of *but-for* causation . . . . This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." 570 U.S. at ---, 133 S. Ct. at 2533; *see also Kwan*, 737 F.3d at 845 ("[A] plaintiff alleging retaliation in violation of Title VII must show that retaliation was a 'but-for' cause of the adverse action, and not simply a 'substantial' or 'motivating' factor in the employer's decision."); *Weber*, --- F. Supp. 2d. at ---, 2013 WL 5416868, at *29 ("Title VII retaliation claims must be proved according to traditional principles of but-for causation" (quoting *Russo*, --- F. Supp. 2d at ---, 2013 WL 5346427, at *18)); *Russo*, --- F. Supp. 2d at ---, 2013 WL 5346427, at *18 ("Title VII retaliation claims must be proved according to traditional principles of *but-for* causation . . . ." (alteration in original) (citation omitted)); *Leacock v. Nassau Health Care Corp.*, No. 08-CV-2401, 2013 WL 4899723, at *11 (E.D.N.Y. Sept. 11, 2013) ("[D]uring the final stage of the burden shifting frame-work, the plaintiff must show that retaliation was a but-for cause of the adverse employment action." (citation and internal quotation marks omitted)); *Dall*, --- F. Supp. 2d at ---, 2013 WL 4432354, at *19 ("If the employer succeeds at the second stage, then the presumption of retaliation dissipates, and the plaintiff must show that, but for the protected activity, he would not have been

terminated."); *Moore*, 2013 WL 3968748, at *14 (same). In order to establish but-for causation, Plaintiff must prove that his termination would not have occurred in the absence of a retaliatory motive. "A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." *Kwan*, 737 F.3d at 846.

Defendants argue that Plaintiff cannot meet his burden to show causation at this pretext stage, where mere temporal proximity is insufficient. (Def. Mem. 17.) Plaintiff argues that Defendants' failure to provide legitimate reasons for the actions that it took is evidence of pretext, and concludes that "a jury may reasonabl[y] conclude that the employer's decision was motivated by an intent to retaliate." (Pl. Mem. 29–30.) As discussed *supra* in section II.d.i.3, Plaintiff cannot meet his burden to show that Defendant's stated reasons for initiating disciplinary charges against Plaintiff and the concomitant pre-hearing and post-hearing suspensions are pretextual. Plaintiff's reliance on the entirely speculative allegation that the charges were fabricated is insufficient to meet his burden at this stage.

Plaintiff argues that Defendants' reasons for generating the August 17, 2009 counseling memorandum were entirely fabricated and therefore pretextual. (Tr. 40:20–41:5.) Plaintiff asserts that he was at work on the days that he was marked as absent. However, other than Plaintiff's conclusory statement that he was not absent, there is no other evidence in the record to support this claim. This claim, standing alone, is insufficient to establish that Defendants' reason for generating the memorandum is pretextual.[16]

---

[16] Defendants point to evidence in the record that Florentino, upon hearing Plaintiff's protest to the counseling memorandum, met with Plaintiff and Plaintiff's union representative to discuss the matter, and Plaintiff produced doctor's notes to explain the undocumented absences. While Plaintiff suggests that "perhaps Ms. Florentino is confusing the two," Plaintiff had the opportunity to clarify this issue during Florentino's deposition and did not.

In sum, while Plaintiff can state a *prima facie* case of retaliation under Title VII, he cannot establish that, but for his June 17, 2009 email complaints (forwarded to Harris and Barneys on June 19, 2009) about the lack of accommodation to his religious needs, and Plaintiff's "resistance" to Alaniz's conduct, he would not have been suspended or issued the counseling memorandum. Accordingly, Plaintiff's retaliation claims pursuant to Title VII and the NYSHRL are dismissed.

### e. Hostile Work Environment Under Title VII, the NYSHRL and § 1983

Plaintiff argues that the totality of events between April and October 2009 demonstrate a hostile work environment claim. (Pl. Mem 30–31.) Defendants argue that the incidents relied on by Plaintiff to establish a hostile work environment are, at best, "episodic" or "boorish," but not "severe or pervasive" as required under Title VII and the NYSHRL. (Def. Mem. 18, 20.)

In order to establish a hostile work environment claim under Title VII, a plaintiff must produce evidence that the complained of conduct "(1) is objectively severe or pervasive — that is, creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's sex, or another protected characteristic."[17] *Robinson v.*

---

[17] The same standards apply to the plaintiff's hostile environment claim arising under the NYSHRL and § 1983. *See Rivera v. Rochester Genesee Reg'l Transp. Auth.*, --- F. App'x ---, ---, 2014 WL 518791, at *5 n.4 (2d Cir. Feb. 10, 2014) (" The same standards [as are applied to Title VII] apply to the plaintiffs' hostile environment claims arising under the NYSHRL, and to their claims arising under 42 U.S.C. § 1981" (citing, inter alia, *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 (2d Cir. 2000))); *Summa*, 708 F.3d at 123–24 ("Hostile work environment claims under both [federal law] and the NYSHRL are governed by the same standard." (citing *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 609 (2d Cir. 2006))); *Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006) ("[Section] 1983 and the Equal Protection Clause protect public employees from various forms of discrimination, including hostile work environment . . . on the basis of gender. Once action under color of state law is

*Harvard Prot. Servs.*, 495 F. App'x 140, 141 (2d Cir. 2012) (internal quotation marks omitted) (quoting *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007)). To withstand summary judgment, Plaintiff must produce evidence that "the workplace was 'so severely permeated with discriminatory intimidation, ridicule, and insult, that the terms and conditions of her employment were thereby altered.'" *Mills v. S. Connecticut State Univ.*, 519 F. App'x 73, 75 (2d Cir. 2013) (quoting *Desardouin v. City of Rochester*, 708 F.3d 102, 105 (2d Cir. 2013)). One incident may support a claim for hostile work environment if it is sufficiently severe. *See Das v. Consol. Sch. Dist. of New Britain*, 369 F. App'x 186, 189–90 (2d Cir. 2010). Otherwise, "incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Id.* at 189–90 (quoting *Alfano*, 294 F. 3d at 374 (2d Cir. 2002)).

While "the central statutory purpose [of Title VII was] eradicating discrimination in employment, Title VII does not set forth a general civility code for the American workplace." *Redd v. New York Div. of Parole*, 678 F.3d 166, 176 (2d Cir. 2012) (alteration in original) (internal quotation marks omitted) (quoting *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 771 (1976) and *Burlington Northern*, 548 U.S. at 68). "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment — an environment that a reasonable person would find hostile or abusive — is beyond Title VII's purview." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993); *see also Russo*, --- F. Supp. 2d at ---, 2013 WL 5346427, at *12. "Isolated incidents generally will not suffice to establish a hostile work environment unless they are extraordinarily severe." *Kaytor*, 609 F.3d at 547. "In other words, '[s]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.'" *Illiano v.*

established, the analysis for such claims is similar to that used for employment discrimination claims brought under Title VII . . . .").

*Mineola Union Free Sch. Dist.*, 585 F. Supp. 2d 341, 350 (E.D.N.Y. 2008) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). A plaintiff may only recover on a hostile work environment claim if the hostile work environment occurs because of an employee's protected characteristic. *Rivera v. Rochester Genesse Regional Transp. Auth.*, 702 F.3d 685, 693 (2d Cir. 2012) (citing *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001)).

Plaintiff alleges the following facts in support of his hostile work environment claim: (1) Alaniz's purportedly derogatory comments about Plaintiff's religious dress, (2) Alaniz's refusal to allow Plaintiff to arrive late at the April 3, 2009 meeting, (3) the termination of Plaintiff's use of compensatory time to attend prayers, (4) termination of the Mosque as an enrollment site, (5) scheduling Plaintiff for a counseling session in August 2009 based on excessive absences, (6) Plaintiff's October 2009 suspension, and (7) the deposition of Steven Rovt in which Rovt describes feeling intimidated or singled out for being Jewish. (Pl. Mem. 31.) In weighing the "the totality of the circumstances" the Court concludes that these incidents, even when considered in the aggregate, did not create a workplace "so severely permeated with discriminatory intimidation, ridicule, and insult, that the terms and conditions of [Plaintiff's] employment were thereby altered." *See Mills*, 519 F. App'x at 75.

The Court assumes without deciding that the incidents that have an arguable connection to Plaintiff's attendance at Friday prayers or to Plaintiff's religion — Alaniz's comments that Plaintiff's religious garb is "unprofessional according to American culture," and that Plaintiff was "stealing time" by not formally documenting his extended lunch on Fridays to attend prayer, his refusal to approve Plaintiff's late arrival at the April 3, 2009 meeting, his termination of Plaintiff's use of compensatory time to attend Friday prayer, and his discontinuance of the mosque as a work site — are discriminatory. However, even assuming that they are, they do not,

individually or collectively, provide sufficient support to satisfy the high burden of showing that Plaintiff was subjected to "severe or pervasive" hostility because of religion.

Plaintiff is required to show that "a single incident was extraordinarily severe, or that a series of incidents were 'sufficiently continuous and concerted' to have altered the conditions of [his] working environment." *See Alfano*, 294 F.3d at 74. Plaintiff has not presented any evidence to demonstrate that Alaniz's comments were sufficiently severe or pervasive so as to fundamentally transform his workplace. These four incidents were limited to April or May of 2009 and none, individually or collectively, materially altered the terms of Plaintiff's environment. Accordingly, they are are insufficient to contribute to the creation of a hostile work environment. *See Chukwueze v. NYCERS*, 891 F. Supp. 2d 443, 455 (S.D.N.Y. 2012) (finding no hostile work environment where plaintiff "identifies only three incidents over the course of a year in which he was 'chastised' or 'berated' in front of his unit before ultimately being given the time off that he requested"). For example, while Plaintiff was no longer allowed to work at the mosque, Plaintiff continued to attend prayers at the mosque. Not being able to combine his work duties with his religious responsibilities, while disappointing to Plaintiff, did not contribute to the creation of a hostile work environment. Likewise, Alaniz's comments, while less than diplomatic, are hardly the kind of "steady barrage of opprobrious" comments that can contribute to a hostile work environment. *See Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (explaining that "a steady barrage of opprobrious racial comments" rather than "sporadic racial slurs" is required to sustain harassment claim); *St. Louis v. N.Y.C. Health & Hosp. Corp.*, 682 F. Supp. 2d 216, 234 (E.D.N.Y. 2010) (holding that the "isolated remarks" of plaintiff's supervisor "that she did not like working with a female and had never had a female assistant [] amount to mere 'stray remarks' that do not constitute a hostile work environment").

These incidents cannot support Plaintiff's claim that he was subjected to a hostile work environment.

As for the remaining incidents — Plaintiff's suspension without pay in October 2009 and the August 2009 counseling memorandum and session — there is no evidence, as discussed *supra* in part II.d.i.1.B, that either of these actions were "because of" Plaintiff's religion. *See Alfano*, 294 F.3d at 377 ("Everyone can be characterized by sex, race, ethnicity, or (real or perceived) disability; and many bosses are harsh, unjust, and rude. It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeals."). Absent any evidence that Defendants were motivated by Plaintiff's religion in taking these personnel actions, these incidents do not contribute to the creation of a hostile work environment. *See Russo*, --- F. Supp. 2d at ---, 2013 WL 5346427, at *13–14 (finding that supervisor's screaming at plaintiff in a vulgar manner did not create a hostile work environment as it was not "because of" plaintiff's gender); *Dall*, --- F. Supp. 2d at ---, 2013 WL 4432354, at *18 (finding that conduct of co-workers in speaking frequently about their sex lives and showing explicit photographs in the workplace did not create a hostile work environment as it was not conduct to "intimidate, ridicule, or demean him on account of his gender or any other protected characteristic"); *Parekh v. Swissport Cargo Servs., Inc.*, No. 08-CV-1994, 2009 WL 290465, at *5 (E.D.N.Y. Feb. 5, 2009) (granting motion to dismiss hostile work environment claim where "[p]laintiff's complaints concerning unfair disciplinary actions, shift changes, reduction in manpower, wrongfully withheld vacation time, failure to provide him with proper equipment, workplace transfers, failure to promote, and his termination contain no suggestion of hostility or offensiveness"); *Goldschmidt v. New York State Affordable Hous.*

*Corp.*, 380 F. Supp. 2d 303, 312–13 (S.D.N.Y. 2005) (finding that "defendants' extensions of plaintiff's probations and the January 2002 negative performance evaluation" were not "accompanied by overt acts of insult or harassment based on plaintiff's religion" and consequently did not support a hostile work environment claim).

In support of his hostile work environment claim, Plaintiff presents a sworn deposition testimony of a former employee of Metro Plus, Steve Rovt. Plaintiff proffers this testimony as further proof that Metro Plus subjected Plaintiff to a hostile work environment on the basis of his religion because Metro Plus has a pattern of discriminating against religious minorities. Steven Rovt is an Orthodox Jew. (Pl. Mem. 32 (citing Pl. Ex. 21, Deposition of Steven Rovt ("Rovt Dep.") 21–22).) Rovt requested and was granted permission from Metro Plus to use an alternate work schedule, which allowed him to attend religious services on Fridays. (Pl. Mem. 32 (citing Rovt Dep. 35–38).) Rovt claims that he was intimidated by Harris and that although he was granted a religious accommodation, Metro Plus's management made him feel as though he could not make use of it. (Pl. Mem. 32 (citing Rovt Dep. at 39).) Rovt also testified at his deposition that he failed to speak out about this unfair treatment because he felt intimidated and feared being fired. (Rovt. Dep. 41–43.) Plaintiff and Rovt worked in different departments and had different supervisors. Furthermore, Plaintiff's claim is that Alaniz, not Harris, created a hostile working environment for him. There is nothing in the record to indicate that Alaniz worked with Rovt, or that Harris supervised Plaintiff. Rovt's testimony about the conditions he faced that may have been created by a different supervisor in a different department provide no support for Plaintiff's claim.

In sum, because Plaintiff has not produced any evidence to show that he was subject to either a "severe" or "pervasive" hostile work environment amounting to an alteration in

Plaintiff's work conditions, the Court grants summary judgment to Defendants on Plaintiff's hostile work environment claims under Title VII, the NYSHRL and § 1983.

### f. NYCHRL claims

Plaintiff brings claims of religious discrimination in violation of the NYCHRL. (Am. Compl. ¶¶ 69–76.) "District courts may decline to exercise supplemental jurisdiction over a claim if the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine — judicial economy, convenience, fairness, and comity — will point toward declining to exercise jurisdiction over the remaining state-law claims." *Pension Ben. Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 727 (2d Cir. 2013) (citations and internal quotation marks omitted); *see also One Commc'ns Corp. v. J.P. Morgan SBIC LLC*, 381 F. App'x 75, 82 (2d Cir. 2010) ("If all of a plaintiff's federal claims are dismissed, a district court is well within its discretion to decline to assert supplemental jurisdiction over any state law claims"); *Sullivan v. City of New York*, No. 10-CV-0038, 2011 WL 3806006, at *6 (S.D.N.Y. Aug. 29, 2011) ("where federal claims are dismissed before trial, the state [claims] should be dismissed as well" (quoting *Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998)). The Court declines to exercise supplemental jurisdiction over the remaining state law claims. Plaintiff's state law claims are therefore dismissed without prejudice.

## III. Conclusion

For the foregoing reasons, the Court grants Defendants' motion for summary judgment as to Plaintiff's claims brought pursuant to Title VII, NYSHRL and § 1983. The Court declines to

exercise supplemental jurisdiction over Plaintiff's claims brought pursuant to the NYCHRL and

dismisses those claims without prejudice.  The Clerk of the Court is directed to close the case.

SO ORDERED:


_____s/MKB_____
MARGO K. BRODIE
United States District Judge

Dated: March 28, 2014
      Brooklyn, New York